Joshua Prince, Esq.
ID No. 306521
Allen Thompson, Esq.
ID No. 316424
Prince Law Offices, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(610) 845-3803 (t)
(610) 845-3903 (f)
Joshua@PrinceLaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANDREW DISSINGER,** | : | |
| 844 Salisbury Court | : | **Civil No.** |
| Lancaster, PA 17601 | : | |
| **Plaintiff** | : | **CIVIL RIGHTS COMPLAINT** |
| | : | **42 U.S.C. § 1983** |
| **v.** | : | |
| | : | |
| **MANHEIM TOWNSHIP** | : | **JURY TRIAL DEMANDED** |
| **SCHOOL DISTRICT,** | : | |
| P.O. Box 5134 School Road | : | |
| Lancaster, PA 17606-5134 | : | |
| | : | |
| **MANHEIM TOWNSHIP,** | : | |
| 1840 Municipal Drive | : | |
| Lancaster, PA 17601 | : | |
| | : | |
| **GENE FREEMAN,** | : | |
| 611 Field Club Road | : | |
| Pittsburgh, PA 15238 | : | |
| | : | |
| **TIMOTHY WILLIAMS,** | : | |
| P.O. Box 5134 School Road | : | |
| Lancaster, PA 17606-5134 | : | |
| | : | |
| **SHANNON MAYFIELD,** | : | |
| 5898 Lancaster Avenue | : | |
| Philadelphia, PA 19131 | : | |
| | : | |
| **ROGER BLANTZ,** | : | |
| P.O. Box 5134 School Road | : | |
| Lancaster, PA 17606-5134 | : | |
| **Defendants** | : | |

## COMPLAINT

Plaintiff Andrew Dissinger, by and through his counsel Joshua Prince, Esq., and Prince Law Offices, P.C., hereby files this civil rights action against Manheim Township School District, Superintendent Gene Freeman, Assistant to the Superintendent for Secondary Curriculum Timothy Williams, Assistant Principal Shannon Mayfield, and Officer Roger Blantz.  Defendants School District and Township are being sued for equitable relief and compensatory damages only.  Defendants Freeman, Williams, Mayfield, and Blantz are being sued in their individual capacities for equitable relief and damages.

### JURISDICTION AND VENUE

1.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988.

2.  Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343(a).

3.  Venue is proper in this Court based on 23 U.S.C. § 1391(b), as all events related to this action occurred in Lancaster County, which is within the Eastern District of Pennsylvania.

### PARTIES

4.  Plaintiff Andrew Dissinger ["Mr. Dissinger"] is an adult resident of Lancaster County, Pennsylvania.  At the time of the incident in question, Mr. Dissinger was a senior in high school, attending Manheim Township High School.

5.  Defendant Manheim Township School District ["School District"] is a school district located in Lancaster County, Pennsylvania and organized pursuant to the

Public School Code of 1949, Act of March 10, 1949, P.L. 30, as amended, 24 P.S. § 1-101, *et seq.*  Defendant School District was, at all relevant times, acting under color of law and is a "person" under 42 U.S.C. § 1983.  Defendant School District is being sued for equitable relief and compensatory damages.

6.  Defendant Manheim Township ["Township"] is a municipal corporation duly organized, existing, and operating under and pursuant to the applicable laws of the Commonwealth of Pennsylvania.  At all relevant times, Defendant Township was the employer of Defendant Blantz and, as such, has responsibility for the hiring, firing, training, supervision, discipline, and retention of police officers, including the assignment of officers as School Resource Officers.  Defendant Township assigned Defendant Blantz to Defendant School District as a School Resource Officer.  Defendant Township is a "person" under 42 U.S.C. § 1983 and at all relevant times was acting under color of law.  Defendant Township is being sued for equitable relief and compensatory damages.

7.  Defendant Gene Freeman ["Freeman"] was, at all relevant times, the Superintendent of Manheim Township School District.  As Superintendent, Defendant Freeman was responsible for the creation and execution of official policy for Defendant School District and had policy- and decision-making authority.  Defendant Freeman is a "person" under 42 U.S.C. §1983 and, at all relevant times, was acting under color of law.  He is being sued in his individual capacity for equitable relief and damages.

8.  Defendant Timothy Williams was, at all relevant times, Assistant to the Superintendent for Secondary Curriculum.  As Assistant to the Superintendent,

Defendant Williams was responsible for, *inter alia*, holding student disciplinary hearings and issuing disciplinary decisions, and had policy- and decision-making authority. Defendant Williams is a "person" under 42 U.S.C. § 1983 and, at all relevant times, was acting under color of law. He is being sued in his individual capacity for equitable relief and damages.

9. Defendant Shannon Mayfield was, at all relevant times, Assistant Principal for Manheim Township High School. As Assistant Principal, Defendant Mayfield had policy- and decision-making authority as to disciplinary measures of Manheim Township High School students, including Mr. Dissinger. Defendant Mayfield is a "person" under 42 U.S.C. § 1983 and, at all relevant times, was acting under color of law. He is being sued in his individual capacity for equitable relief and damages.

10. Defendant Roger Blantz was, at all relevant times, a School Resource Officer at Manheim Township School District. Defendant Blantz is/was employed by the Manheim Township Police Department ["MTPD"] and is/was assigned to the Manheim Township School District as a School Resource Officer. Defendant Blantz is a "person" under 42 U.S.C.A. § 1983 and at all relevant times was acting under color of law. He is being sued in his individual capacity for equitable relief and damages.


**FACTS**

11. In May, 2012, Mr. Dissinger was a senior at Manheim Township High School.

12. Mr. Dissinger attended the Manheim Township High School Prom on Saturday, May 19, 2012.

13. The prom was held at the Downtown Lancaster Convention Center Marriott Hotel.

14. Subsequent to the prom, Manheim Township High School held a post-prom party on the High School grounds.

15. Mr. Dissinger arrived at the post-prom party at approximately 11:30 pm on the night of May 19th.

16. After checking in to the party, Mr. Dissinger and his girlfriend at the time began to argue.

17. At approximately that time, several parents and/or chaperones informed Defendant Blantz that they had concerns about Mr. Dissinger's behavior.  See Hearing Testimony, at 46-47, attached hereto and incorporated herein as Exhibit A. [1]

18. The parents and/or chaperones were not employees of Defendant Township and/or Defendant School District.

19. Defendant Blantz then informed Defendant Mayfield that he had received reports from the parents/chaperones concerning Mr. Dissinger.  *See* Exhibit A, at 46.

20. Based on this information, Defendant Mayfield located Mr. Dissinger and brought him to a classroom to question him.  *See* Exhibit A, at 47.

21. Defendant Blantz accompanied Defendant Mayfield and Mr. Dissinger into the classroom where the questioning took place.  *See* Exhibit A, at 26, 49.

---

[1] Pagination is to transcript page, not Exhibit page.

22. Defendant Mayfield asked Mr. Dissinger if he had consumed alcohol, to which Mr. Dissinger answered that he had not.  *See* Exhibit A, at 49.

23. Mr. Dissinger informed Defendants Mayfield and Blantz that he had been arguing with his girlfriend.  *See* Exhibit A, at 49.

24. Defendant Mayfield did not notice that Mr. Dissinger appeared at all intoxicated as they walked through the high school campus to the classroom.  *See* Exhibit A, at 48.

25. Defendant Mayfield's sole reason for believing that Mr. Dissinger may have consumed alcohol was that his face was red and he was "visibly upset."  *See* Exhibit A, at 48.

26. Defendant Mayfield was entirely uncertain as to what activities Mr. Dissinger had been engaged in while at the post-prom party: for example, Defendant Mayfield admitted that Mr. Dissinger's face could have been red from playing dodge ball or any other even that could cause his face to be red.  *See* Exhibit A, at 48.

27. Defendant Mayfield also acknowledged that Mr. Dissinger was "visibly upset" about the fight with his girlfriend, which had left him "shaken."  *See* Exhibit A, at 49.

28. Despite Mr. Dissinger's denial of alcohol consumption, Defendant Mayfield desired to "be clear and safe" and requested a field sobriety test from Defendants Blantz and Township. *See* Exhibit A, at 49.

29. Mr. Dissinger did not feel that he could refuse the Breathalyzer test.  *See* Exhibit A, at 35.

30. Mr. Dissinger, was not informed by Defendants Mayfield or Blantz that he was free to leave the room without taking the Breathalyzer test.  *See* Exhibit A, at 26-27, 68.

31. Mr. Dissinger was not informed by Defendants Mayfield or Blantz that he was not required to take the Breathalyzer test.  *See* Exhibit A, at 27, 68-69.

32. Mr. Dissinger was not informed that he had a right not to talk to Defendants Mayfield or Blantz.  *See* Exhibit A, at 27, 68.

33. Mr. Dissinger was not read *Miranda* rights, in any form, by either Defendants Mayfield or Blantz.  *See* Exhibit A, at 27, 69.

34. Approximately fifteen (15) minutes after Defendants Mayfield and Blantz requested the field sobriety test, another MTPD officer arrived with the test.  *See* Exhibit A, at 49-50.

35. The Breathalyzer test was then performed and yielded a positive result for alcohol consumption.  *See* Exhibit A, at 50.

36. Mr. Dissinger's father, Detective Christopher Dissinger ["Det. Dissinger"], was then called to the school by Defendants Mayfield and Blantz.  *See* Exhibit A, at 4, 27, 51.

37. When Det. Dissinger arrived at the school, he was informed by Defendant Mayfield that Mr. Dissinger would be suspended.  *See* Exhibit A, at 6, 51-52.

38. However, Det. Dissinger was not informed as to the length or scope of the suspension at that time.

39. While at the post-prom event, Defendant Mayfield informed Mr. Dissinger and Det. Dissinger that they would have to meet in Defendant Mayfield's office on Monday, May 21, 2012. *See* Exhibit A, at 5-6, 27, 52.

40. Following the incident, at approximately 5 am on Sunday, May 20, Defendant Mayfield prepared an incident report outlining the events that had just occurred. *See* Exhibit A, at 52-53.

41. This document was not given to either Mr. Dissinger or his parents. *See* Exhibit A, at 53.

42. When Mr. Dissinger and his father attended the meeting on May 21, 2012 ["May 21 Meeting"], they were informed by Defendant Mayfield that Mr. Dissinger was to be suspended for the rest of the school year, inclusive of extracurricular activities and the graduation ceremony. *See* Exhibit A, at 7-8, 54.

43. There were more than ten (10) days remaining in the school year.

44. At the May 21 Meeting, Defendant Mayfield also informed Mr. Dissinger and his parents that "there would be an opportunity to discuss this further or to challenge this further, but it wouldn't be at the school level." *See* Exhibit A, at 54.

45. At the May 21 Meeting, none of the participants were placed under oath. *See* Exhibit A, at 7.

46. No transcript was taken of the May 21 Meeting. *See* Exhibit A, at 7.

47. When Det. Dissinger informed Defendant Mayfield that he wanted to appeal the suspension, Defendant Mayfield informed him that he needed to set up an additional meeting with the assistant superintendent. *See* Exhibit A, at 9-10.

48. A meeting was set for, and held on, Wednesday, May 23, 2012 ["May 23 Meeting"].  *See* Exhibit A, at 10-11.

49. While Defendant Mayfield testified that it was his belief that Mr. Dissinger and/or his parents were notified, he could not say whether that notice was sent via certified mail.  *See* Exhibit A, at 62-63.

50. Defendant Mayfield also acknowledged that three days written notice was not given to Mr. Dissinger or his parents prior to the hearing at the School District. *See* Exhibit A, at 63.

51. Defendant Williams also testified that three days' written notice was not provided to the Dissingers.  *See* Exhibit A, at 80.

52. Defendant Mayfield testified that he was not certain that *any* written notice had been given to Mr. Dissinger or his parents prior to the hearing at the School District.  *See* Exhibit A, at 63.

53. While Defendant Mayfield testified that he generated a letter on May 21 informing the Dissingers of the School District meeting, he did not know if any letter was actually mailed to Mr. Dissinger.  *See* Exhibit A, at 64-65.

54. The May 23 Meeting was held in a conference room at the Township District Office.  *See* Exhibit A, at 11.

55. No court reporter was present at the May 23 Meeting, nor was it recorded in any way.  *See* Exhibit A, at 63-64.

56. The hearing procedures involved for disciplinary actions such as those being instituted against Mr. Dissinger were not available for students or parents in the Code of Conduct.  *See* Exhibit A, at 67.

57. According to Defendant Williams' testimony, these hearings are held at least once
    a year, because "typically every year, there's some issue like this."  *See* Exhibit A,
    at 71.

58. Defendant Williams admitted that he does not have authority to expel any
    students.  *See* Exhibit A, at 72, 73.

59. Defendant Williams expressly denied that the hearing was a formal hearing,
    instead referring to the hearing as a "superintendent's hearing."  *See* Exhibit A, at
    71-72, 80.

60. Defendant Williams expressly referred to the May 23 Meeting as an "informal
    hearing."  *See* Exhibit A, at 80.

61. In attendance at the May 23 Meeting were: Mr. Dissinger; his mother and father;
    Defendant Mayfield; and Defendant Williams.  *See* Exhibit A, at 11.

62. The Dissingers were sworn in by Defendant Williams.  *See* Exhibit A, at 12, 74.

63. Mr. Williams informed the Dissingers *at the May 23 Meeting* that they had a right
    to cross-examine witnesses and make a statement.  *See* Exhibit A, at 12.

64. Mr. Dissinger had not been notified prior to the meeting – or at the meeting – that
    he was authorized to call his own witnesses.  *See* Exhibit A, at 12.

65. Only one witness from Defendant School District was in attendance.  *See* Exhibit
    A, at 12.

66. After the meeting, Defendant Williams upheld Mr. Dissinger's suspension.  *See*
    Exhibit A, at 13.

67. When Mr. Dissinger's father asked about appealing the decision of the May 23
    Meeting, Defendant Williams advised against an appeal, threatening that it was

possible the school board could expel Mr. Dissinger, in which case he would not receive his diploma.  *See* Exhibit A, at 13-14.

68. At no point in the proceedings was Mr. Dissinger informed of his right to have a formal hearing before the school board.  *See* Exhibit A, at 14.

69. At no point was Mr. Dissinger informed that he had a right to attend classes prior to a final determination by the school board.  *See* Exhibit A, at 14; 22 Pa. Code § 12.8(c).

70. Mr. Dissinger was not able to attend classes prior to any of the Meetings.

71. Mr. Dissinger had completed all academic requirements for graduation.

72. Mr. Dissinger would otherwise have been allowed to participate in the graduation ceremony but was denied the ability to attend graduation because of the expulsion.

## COUNT I – 14TH AMENDMENT DUE PROCESS VIOLATION
### (Defendants School District, Freeman, Williams, and Mayfield)

73. When a state creates a property interest, such as the right to a free public education, the Due Process Clause of the Fourteenth Amendment to the United States Constitution applies.  *See Goss v. Lopez*, 419 U.S. 565, 573 (1975).

74. Title 22 of the Pennsyvlania Code, Section 12.8(a) expressly provides: "Education is a statutory right, and students shall be afforded due process if they are to be excluded from school.  In a case involving a possible expulsion, a student is entitled to a formal hearing."

75. Because "young people do not shed their constitutional rights at the schoolhouse door," the Fourteenth Amendment applies to conduct by school officials.  *Id*., at 574 (internal marks omitted).

76. "Boards of Education [are] not excepted" from the requirements of Due Process. *West Virginia Board of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

77. Thus, the "State is constrained to recognize a students' legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."  *Goss*, 419 U.S. at 574.

78. Suspensions longer than ten (10) days, or expulsions, are subject to more a more rigorous analysis than suspensions approximately ten (10) days or less.  *Goss*, 419 U.S. at 584.

79. Suspensions longer than ten (10) days are considered "expulsions," in which case a formal hearing is required.  *See* 22 Pa. Code § 12.6(b).

80. "Expulsion is exclusion from school by the governing board for a period exceeding 10 school days and may be permanent expulsion from the school rolls. Expulsions require a prior formal hearing . . ."  22 Pa. Code § 12.6(b).

81. Mr. Dissinger also had a liberty or property interest in attending his graduation ceremony, such that due process was required.  *See Lee v. Weisman*, 505 U.S. 577, 595 (1992)(holding that attendance at high school graduation was not truly voluntary given the social importance placed on the event, such that a student was constructively required to hear invocation given at beginning of ceremony).

82. "Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions. . . .  Attendance may not be required by official decree, yet it is apparent that a student is not free to absent [himself] from the graduation exercise in any real sense of the term 'voluntary,' for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all [his] high school years.  Graduation is a time for family and those closest to the student to celebrate success and express mutual wishes of gratitude and respect, all to the end of impressing upon the young person the role that it is his or her right and duty to assume in the community and all of its diverse parts."  *Id.*

### a.  Monell *Claim Against Defendant School District*

83. Municipal liability attaches for the actions of an official in one of three instances: (1) where the official or employee acted pursuant to municipal policy or custom; (2) where an official "has policy making authority rendering his or her behavior an act of official government policy"; and (3) where an official ratifies the actions of a subordinate, "rendering such behavior official for liability purposes."  *See McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005).

84. A school district is a "person" under 42 U.S.C. § 1983 and may be sued for deprivations of constitutional rights.  *See Id*, at 369.

85. In order for an official to be considered a policymaker, he or she must have final, unreviewable decision-making policy.  *See McGreevy,* 413 F.3d at 369.

86. Defendant Williams' admitted that it was Defendant School District's policy, practice, and/or custom to hold informal hearings for disciplinary infractions that could result in expulsion.  *See* Exhibit A, at 71.

87. Because under the law, a suspension in excess of ten (10) days is considered an expulsion, and because Defendant Williams stated that he does not have expulsion authority, he cannot lawfully have issued a suspension greater than ten (10) days.

88. However, it was Defendant School District's policy, practice, or custom to have Defendant Williams issue such disciplinary measures.

89. Defendant School District's policy, therefore, violated Mr. Dissinger's Due Process rights.

90. Because Defendant Williams is a school official capable of making final decisions, he is a decision-maker with policymaking authority, thus rendering his decisions official policy.

91. Because the actions of Defendant Williams constitute Manheim Township School District Policy, Defendant School District is liable for the deprivation of Mr. Dissinger's constitutional right to due process.

92. Even if Defendant Williams' actions were *not* considered official policy, the ratification of the decision(s) by Defendant Freeman constituted official policy, thus making Defendant District liable.

93. "[E]ven one decision by a school superintendent, if s/he were a final policymaker, would render his or her decision district policy."  *McGreevy,* 413 F.3d at 369.

94. Defendant Freeman, as Superintendent, was responsible for the policies, practices, and customs of Defendant School District, or acquiesced in those policies,

practices, and customs. *See* Manheim Township School District Code of Student Conduct Introductory Letter, attached hereto and incorporated herein as Exhibit B.

95. As Superintendent, Defendant Freeman's disciplinary decisions were final and unreviewable; indeed, the hearing that Mr. Dissinger was given was referred to as a "superintendent's meeting" and was offered in place of a full school board hearing.

96. Defendant School District, itself, did not conform to the requirements of 22 Pa. Code § 12.6 when it failed to conduct a formal hearing prior to excluding a student from school for more than ten (10) days.

97. Defendant School District, itself, violated Mr. Dissinger's Due Process rights when it failed to: (1) provide written notice via certified mail at least three (3) days in advance of a formal hearing, pursuant to 22 Pa. Code 12.8(b)(1) through (2); transcribe or record the audio of the disciplinary hearings, pursuant to 22 Pa. Code 12.8(b)(8); failed to provide a formal hearing pursuant to 22 Pa. Code 12.8.

98. Defendant School District, itself, violated Mr. Dissinger's Due Process rights when it adopted a policy, practice, or custom of allowing Defendant Williams – who was unauthorized to grant expulsions – to conduct hearings and discipline students in excessive of his authority.

99. Because the actions of Defendant School District violated Mr. Dissinger's rights, it is liable.

### b. *Individual Defendants Freeman, Williams, and Mayfield.*

100. Because Defendant Freeman's policies, practices, and/or customs, or acquiescence to those policies, practices, and/or customs directly led to the deprivation of Mr. Dissinger's rights, he is liable.

101. Defendant Williams' actions directly led to the deprivation of Mr. Dissinger's rights, as he did not follow the Pennsylvania Code's requirements for a formal hearing prior to an expulsion.

102. Indeed, Defendant Williams did not even have authority to issue the punishment he did, as only the school board is authorized to issue suspensions/expulsions longer than ten (10) days.

103. Because Defendant Williams' actions deprived Mr. Dissinger of his rights, he is liable.

104. Defendant Mayfield's actions directly led to the deprivation of Mr. Dissinger's rights when he: (1) informed Mr. Dissinger that he was "suspended" for the remainder of the school year, as that suspension was greater than ten (10) school days, was performed without any hearing, and Defendant Mayfield was not authorized to expel Mr. Dissinger; and (2) failed to notify Mr. Dissinger and/or his parents of the May 23rd hearing via certified mail at least three (3) days prior to the hearing.

**WHEREFORE**, Mr. Dissinger respectfully requests that judgment be entered against Defendants School District, Freeman, Williams, and Mayfield, as follows:

a)      Declaring the actions of Defendants School District, Freeman, Williams, and Mayfield unconstitutional for depriving Mr. Dissinger of a fundamental and statutory right to education without due process of law;

b)      An award of compensatory damages against all Defendants, including legal expenses, as a result of the actions of Defendants School District, Freeman, Williams, and Mayfield;

c)      An award of punitive damages against Defendants Freeman, Williams, and Mayfield;

d)      Ordering the expungement of all records relating to this incident from Mr. Dissinger's school file;

e)      Ordering Defendant School District to institute appropriate policies and training to prevent the further deprivation of rights related to the inadequate process afforded students faced with suspension and/or expulsion;

f)      Attorney fees and costs associated with the instant action;

g)      Any and all other equitable and/or legal remedies this Court may see fit.

## COUNT II - 4TH AMENDMENT UNREASONABLE SEARCH AND SEIZURE

### (Defendants Township, Mayfield, and Blantz)

105.    The Fourth Amendment to the United States Constitution states, in relevant part: "The right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated."

106.     The Fourth Amendment to the United States Constitution applies to actions taken by any government official, including school officials. *See New Jersey v. T.L.O.*, 469 U.S. 325, 335-36 (1985).

107.     Despite large amounts of supervision by the school and its officials, the student maintains an expectation of privacy. *Id.*, at 338-39.

108.     Thus, the invasion of that privacy – the search and/or seizure by a government official – must be reasonable. *Id.*

109.     In order to determine whether the search and/or seizure is reasonable, the United States Supreme Court requires a two-prong analysis: first, whether the search and/or seizure was "justified at its inception"; and second, whether the search was "reasonably related in scope" to the events leading to the search and/or seizure. *Id.*, at 342.

110.     A search and/or seizure is only "'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.*

111.     When a student is *observed* violating the school policy, a school official is authorized to search that student to uncover the evidence of the violation. *Id.,* at 344-45.

### a.  **Monell *Claim Against Defendant Township***

112.     A failure to train its police officers can support a § 1983 claim against a municipal entity.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

113.     Because a police department is considered an administrative arm of the municipality for purposes of "personhood" under 42 U.S.C. § 1983, Defendant Township is liable for the deprivations of its police department, MTPD.  *See Padilla v. Township of Cherry Hill*, 110 Fed.Appx. 272, 278 (3d Cir. 2004).

114.     The inadequacy of, or existence of, the policy that led to the deprivation of rights is a question of fact.  *Id.,* 389-90.

115.     It is not averred that Defendant Blantz was acting outside the scope of his authority and/or duties as a School Resource Officer when he unreasonably searched and/or seized Mr. Dissinger on the night of May 19 and/or the morning of May 20, 2012.

116.     Therefore, it may be inferred that Defendant Blantz was acting pursuant to official policy, practice, or custom of MTPD.

### b.  *Unreasonable Seizure of Mr. Dissinger*

117.     A Fourth Amendment seizure occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

118.      A seizure under the Fourth Amendment also occurs when an individual

submits to the assertion of authority.  *See California v. Hodari D.*, 499 U.S. 621,

626 (1991).

119.      Thus, an individual is seized when, "by means of physical force *or a show*

*of authority*, his freedom of movement is restrained."  *Mendenhall*, 446 U.S. at

553.

120.      Mr. Dissinger was not observed consuming alcohol by any parent or

chaperone.

121.      Mr. Dissinger was not observed consuming alcohol by any Defendant.

122.      Mr. Dissinger was not observed arguing with his girlfriend by Defendants

Mayfield or Blantz, or any other school official.[2]

123.      Rather, Defendant Blantz received reports from parents/chaperones – who

were not school officials - that Mr. Dissinger was arguing with his girlfriend.

124.      Defendant Blantz informed Defendant Mayfield of those reports and,

together, they removed Mr. Dissinger from the post-prom party and took him to a

secluded location.

125.      Neither Defendant Mayfield nor Defendant Blantz informed Mr. Dissinger

that he was free to leave or that he had the right to remain silent.

126.      Defendants Mayfield and Blantz proceeded to interrogate Mr. Dissinger as

to the events of that night.

---

[2] Chaperones at a post-prom dance can hardly count as government "officials."  *See S.L. v. Friends Central School*, 2000 WL 352367, *2 (E.D.Pa. April 5, 2000)(holding that the "seizure" of a transcript of a conversation by a school chaperone was not a violation of federal wiretapping laws because it is not unlawful for a person *not* acting under color of state law to intercept a communication).

127.    Although Defendants Mayfield and Blantz had no objective evidence to believe Mr. Dissinger had consumed alcohol that night, Defendant Mayfield nevertheless questioned Mr. Dissinger about his consumption of alcohol that evening.

128.    Mr. Dissinger did not reasonably feel he could leave, as both the principal of his school (Defendant Mayfield) and a police officer (Defendant Blantz) were present.

129.    Because Mr. Dissinger reasonably felt unable to leave, based on the totality of the circumstances – the presence of both school and police officials, the fact that they took him to a secluded portion of the school building, the fact that they interrogated him, and the fact that they requested a sobriety test – he was seized for purposes of the Fourth Amendment.

130.    Because the seizure was not precipitated by reports of Mr. Dissinger consuming alcohol, nor any observation by any Defendant of Mr. Dissinger consuming alcohol, nor *any* objective evidence, the seizure to determine whether Mr. Dissinger was drinking was unreasonable.

### c.  *Unreasonable Search of Mr. Dissinger*

131.    Mr. Dissinger was unreasonably searched when Defendants Blantz and Mayfield performed a Breathalyzer sobriety test on Mr. Dissinger.

132.    The basis for the search of Mr. Dissinger was the reports of parents/chaperones to Defendant Blantz concerning Mr. Dissinger's behavior.

133.     No chaperone, parent, or Defendant observed, or claims to have observed, Mr. Dissinger consume alcohol.

134.     When Defendants asked Mr. Dissinger if he had consumed alcohol, he answered in the negative.

135.     Defendants Mayfield and Blantz did not claim to have smelled alcohol on Mr. Dissinger's breath.

136.     Defendant Mayfield based the sobriety test on the fact that Mr. Dissinger's face was red.

137.     Defendant Mayfield admitted that Mr. Dissinger's face could have been red from any number of reasons, including engaging in physical games such as dodge ball and being "visibly upset and shaken" by the argument with his girlfriend.

138.     Because the incident which served as the basis for the search and/or seizure was Mr. Dissinger's argument with his girlfriend, not the consumption of alcohol, and because no independent cause or objective evidence existed to believe Mr. Dissinger had consumed alcohol, the search of Mr. Dissinger to uncover evidence of the consumption of alcohol was not "reasonably related in scope" to the events leading up to the search.

139.     Therefore, the search was unreasonable.

140.     Because Defendant Mayfield requested the Breathalyzer search, he is liable for the unreasonable search of Mr. Dissinger.

141.     Because Defendant Blantz requested the Breathalyzer, he is liable for the deprivation of Mr. Dissinger's right to be free from unreasonable searches.

**WHEREFORE**, Mr. Dissinger respectfully requests that judgment be entered against Defendants School District, Freeman, Williams, and Mayfield, as follows:

a)        Declaring the actions of Defendants Township, Mayfield, and Blantz unconstitutional for depriving Mr. Dissinger of his right to be free from unreasonable searches and seizures;

b)        An award of compensatory damages against all Defendants, including legal expenses, as a result of the actions of Defendants Township, Mayfield, and Blantz;

c)        An award of punitive damages against Defendants Mayfield and Blantz;

d)        Ordering proper policies and training as to reasonable searches and seizures for employees of Defendant Township, including School Resource Officers and the MTPD;

e)        Attorney fees and costs associated with the legal actions associated with this action;

f)        Any and all other equitable and/or legal remedies this Court may see fit.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all claims.

Respectfully Submitted,


Joshua Prince, Esq.
Allen Thompson, Esq.
PRINCE LAW OFFICES, P.C.
Attorney for Plaintiff

# EXHIBIT A

1    28497     IN THE COURT OF COMMON PLEAS

     *Josh*   1

                LANCASTER COUNTY, PENNSYLVANIA

2     GA                 CIVIL

   JUL 03 2012

3

4   _____     **COPY**

                       :

5   ANDREW DISSINGER           :

                       :

6         vs.              :    No. CI-12-07485

                       :

7   MANHEIM TOWNSHIP SCHOOL DISTRICT   :

   _____ :

8

9

10

11              PRELIMINARY INJUNCTION

12

           Before:   HONORABLE HOWARD F. KNISELY

13

          Date   :   Thursday, May 31, 2012

14

          Place :   Courtroom Number 5

15                  50 North Duke Street

                  Lancaster, Pennsylvania

16

17   APPEARANCES:

18   Joshua Prince, Esquire, and

    Eric Winter, Esquire

19   Prince Law Offices, P.C.

    646 Lenape Road

20   Bechtelsville, Pennsylvania 19505

      For - The Plaintiff

21

    Robert M. Frankhouser, Jr., Esquire

22   Hartman, Underhill & Brubaker

    221 East Chestnut Street

23   Lancaster, Pennsylvania 17602-2705

      For - The Defendant

24

25   ORDERED:   6-13-2012    LODGED: _____     FILED: _____

```
 1                    INDEX TO WITNESSES

 2   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 3   Christopher Dissinger   3      15      24        --

 4   Andrew Dissinger       25      31      37        --

 5   Shannon Mayfield       42      60      --        --

 6   Timothy Williams       69      77      --        --

 7

 8

 9                    INDEX TO EXHIBITS
10
     Plaintiff's                        Marked
11   Exhibit No.

12   1 - Student Code of Conduct          37

13

14   Defendant's
     Exhibit No.
15
     1 - Letter dated 5-21-12             19
16
     2 - Letter dated 5-24-12             19
17
     3 - Acknowledgement                  32
18
     4 - Report of Incident               37
19

20

21

22

23

24

25
```

3

1    P R O C E E D I N G S

2    (9:12 a.m.)

3    THE COURT:  Matter before the Court this

4  morning is a petition for injunction in the matter of

5  Andrew Dissinger versus Manheim Township School

6  District.  As of this moment, no docket number has been

7  assigned.  I'm sure our Prothonotary's Office will take

8  care of that at some point, but counsel, I think, has

9  been explained as to why it doesn't have a number at

10  this moment.

11    Mr. Winter, did you want to make any kind of an

12  opening statement at all or get right into the

13  testimony?

14    MR. WINTER:  Your Honor, I made some remarks in

15  chambers.  I believe you're aware of the issues, so ...

16    THE COURT:  That's fine.  I just wanted to

17  see.  You may proceed.

18    MR. WINTER:  First call Christopher Dissinger.

19    Take the stand, sir.

20    CHRISTOPHER DISSINGER,
21    called as a witness, being duly sworn or affirmed,
      was examined and testified as follows:

22    DIRECT EXAMINATION

23  BY MR. WINTER:

24    Q.  Mr. Dissinger, are you the father of Andrew

25  Dissinger?

4

1    A.  Yes.

2    Q.  What is Andrew's date of birth?

3    A.  4-22-1994.

4    Q.  And where does Andrew attend school?

5    A.  The Manheim Township High School.

6    Q.  What year is he in school?

7    A.  He's a senior.

8    Q.  Is my understanding correct graduation

9  ceremonies at Manheim Township High School senior class

10  are expected to occur this evening?

11    A.  Yes.

12    Q.  Okay.  All right.  On May the 19th of this

13  year, did you become aware of a disciplinary situation

14  involving your son, Andrew?

15    A.  Yes.

16    Q.  Okay.  How did you become aware of that

17  situation?

18    A.  I was contacted by the high school's school

19  resource officer about Andrew and to come up to the

20  school to pick him up.

21    Q.  Okay.  And approximately what was going on at

22  the school on that evening?

23    A.  There was a post-prom ceremony or party or

24  something of that nature.

25    Q.  What time were you contacted to go to the

5

1  school?

2    A.  I believe it was around 10 minutes before 1 in

3  the morning.  12:50.

4    Q.  Okay.  So did you go to the school at that

5  point?

6    A.  Yes.

7    Q.  What occurred when you arrived at the school?

8    A.  I arrived at the school and I met with the

9  school resource officer.  We walked into the --

10    Q.  Just so the record's clear, what is the name of

11  the school resource officer?

12    A.  Officer Roger Blantz.

13    Q.  Okay.

14    A.  We walked into the -- I would imagine it was

15  the assistant principal's office and we just had a

16  discussion at that point.

17    Q.  Okay.  You had a discussion with the assistant

18  principal?

19    A.  Yes.  Yes.

20    Q.  Who is the assistant principal?

21    A.  Shannon Mayfield.

22    Q.  What was the discussion that you had with

23  Assistant Principal Mayfield?

24    A.  Well, the discussion pretty much -- I mean,

25  they outlined what had happened that day -- or that

6

1  night, and they wanted to have another meeting in his

2  office on Monday morning --

3    Q.  Okay.

4    A.  -- which I agreed to do that.

5    Q.  What were you told, if anything, in relation to

6  discipline for Andrew at that point?

7    A.  At that point, I was -- it was just that he had

8  been suspended for the rest of the year.

9    Q.  Okay.  Was anything said to you at that point

10  in terms of his being able to attend graduation?

11    A.  No.

12    Q.  Okay.  So you have that meeting, and that would

13  have been actually early Sunday morning, correct?

14    A.  Right.  Yes.

15    Q.  Okay.  And what was the next thing that

16  happened in relation to the discipline?

17    A.  The next thing that happened, we had the

18  meeting at the Assistant Principal Shannon Mayfield's

19  office.

20    Q.  That would have been on Monday, the 21st?

21    A.  Yes.  Yes.  And at that point --

22    Q.  Let me stop you there.  Who attended that

23  meeting?

24    A.  I attended, my son attended, Officer Blantz

25  attended and Assistant Principal Mayfield was there.

7

Q. Okay. Had you received any written notice prior to that meeting?

A. No.

Q. Okay. And that meeting, where did it occur specifically?

A. It occurred in his office, the same place we had the meeting Saturday night.

Q. Okay. In the meeting in the assistant principal's office, was anyone put under oath? Was there any type of testimony given?

A. No.

Q. To your knowledge, was the meeting recorded either by a court reporter or by some type of tape recording, electronic recording device in any way, to your knowledge?

A. No.

Q. So what time of day did this meeting occur?

A. I believe it was 9 in the morning. I'm not exactly sure. It was sometime in the morning.

Q. Okay. So the morning, Monday, the 21st?

A. Yes.

Q. So what happened at this meeting?

A. At this meeting, that's when Officer Blantz still laid out what had happened, then that's when the assistant principal had told us exactly what the

8

punishment was going to be; that he was suspended for the rest of the year to include extracurricular activities, and he would not participate in the graduation ceremony.

Q. Okay. In terms of what Officer Blantz laid out, to the best of your recollection, what was it that he had said?

A. Well, he had told us that he -- that a couple parents had made a report to him about erratic behavior of Andrew, so Officer Blantz approached Andrew about the complaint. He was taken into the office and given a Breathalyzer at that point.

Q. Okay. And Andrew was being suspended then based upon an allegation that he had used alcohol; was that your understanding?

A. Yes.

Q. Okay. What was it that the assistant principal, to the best of your recollection, had told you in terms of what the discipline was?

A. He told me that the discipline was that he was suspended for the rest of the year and he could not be on school property except to take his finals, and that he would not be able to participate in any extracurricular activity to include the ceremony -- the graduation ceremony.

9

Q. Okay. Was anything told to you at that point in terms of the suspension being for 40 days or 60 days in relation to extracurricular activities, anything like that?

A. I can't remember if he had told me if it was 60 or 40 days.

Q. Okay. In terms of the procedure for the review of the discipline, what was explained to you at that meeting, to the best of your recollection, in relation to the disciplinary review procedure?

A. Well, from what I remember, it was -- I brought up the fact that I wanted to appeal the decision. I don't know if I gave him time to explain it or not. I just told him that I wanted to appeal, you know -- or I asked him how could I appeal this decision, I want to appeal this decision.

Q. And by him, do you mean Assistant Principal Mayfield?

A. Yes.

Q. Okay.

A. And I said I wanted to appeal, you know, this decision. And he told me that, you know, you can appeal to the assistant -- or to the superintendent's office, but I would have to make a meeting to do that. I would have to call to set up a meeting.

10

Q. Okay. Was anything given to you in writing at that meeting?

A. What was handed to me at that meeting was just laid out that what the discipline was.

Q. Okay. Did you take any steps to have this further reviewed?

A. Yes.

Q. Okay. What did you do next?

A. Well, the next thing, I told Assistant -- Mr. Mayfield my intentions of appealing it, and I received a phone call from, I guess, the secretary of the school district to set up a time to have a hearing in front of the assistant superintendent.

Q. Okay. And do you recall, when did this phone call occur? What day?

A. It occurred that same day. I think it was later that day, maybe in the afternoon.

Q. Was a meeting established for you to meet with the superintendent?

A. Yes, it was.

Q. And when was that meeting set up for?

A. Wednesday.

Q. That would have been the 23rd?

A. Yes.

Q. Okay. Do you recall what time it was on the

11

1   23rd?

2       A.  I believe it was another -- I think it was --

3   actually, I think it was 4 in the afternoon or 3 in the

4   afternoon.  It was sometime in the afternoon.

5       Q.  Okay.  Where did you go for this meeting?

6       A.  Up to the Manheim Township District Office.

7       Q.  Okay.  And what type of room was this?  Was

8   this in a conference room?

9       A.  It was, like, a medium-sized conference room.

10      Q.  Okay.  Who was there in this meeting?

11      A.  I was in the meeting; my wife was in the

12  meeting; Andrew was in the meeting; Mr. Mayfield was in

13  the meeting; and the assistant superintendent,

14  Dr. Williams, was in the meeting.

15      Q.  Okay.  And that was the entirety of the people

16  that were in the meeting?

17      A.  Yes.

18      Q.  Okay.  Was this meeting recorded by a court

19  reporter in any way?

20      A.  No.

21      Q.  Was this meeting tape recorded or

22  electronically recorded in any way?

23      A.  No.

24      Q.  Did anyone administer any type of oath at this

25  meeting?

12

1       A.  Well, basically, what happened was Dr. Williams

2   had said, you know, everybody raise your right hand and

3   swear that everything we're going to say in this meeting

4   is true.

5       Q.  Okay.

6       A.  I mean, if that's an oath.  I mean, there was

7   no Bibles or anything of that nature.  It was just --

8       Q.  Had you received written notice of that

9   meeting?

10      A.  I don't remember.  I believe we received it,

11  but I don't know where the paperwork is.

12      Q.  Okay.  What occurred at this meeting?

13      A.  At the meeting, Dr. Williams pretty much, I

14  mean, he laid out what was going to happen.  He said

15  that the school district was being represented by

16  Mr. Mayfield and they would lay out the facts, and then

17  I had a right to -- or then everybody -- Andrew, my

18  wife, me, we could make a statement and I had the right

19  to, you know, cross-examine witnesses, things of that

20  nature.

21      Q.  Okay.  And so what actually happened?  I mean,

22  who provided statements at this meeting?

23      A.  Well, Mr. Mayfield was the only one that was

24  there from the school district as far as a witness is

25  concerned, and he just, you know, laid out what

13

1   happened.

2       Q.  Okay.

3       A.  And then, you know, then we had an opportunity

4   to make a statement.  And, I mean, I asked Mr. Mayfield

5   questions about that night, and then we -- I made a

6   statement to the -- Dr. Williams.  And that was, you

7   know, the extent of any type of testimony.

8       Q.  Okay.  And what was the conclusion?  What

9   happened after that?  What was the next thing that

10  occurred?

11      A.  The conclusion was that Dr. Williams said that

12  we're upholding the suspension.

13      Q.  Okay.  And what were you told about further

14  review?

15      A.  Well, I told -- I asked, you know -- I want to

16  appeal this decision and I asked about the school board,

17  and Dr. Williams said, well, you know, you can appeal to

18  the school board, but I would advise you don't.  And I

19  asked him why, what difference will it make at this

20  point?  And he goes, well, if you have a school board

21  hearing, and he could be -- they could expel him; and if

22  he's expelled, then he would not receive his diploma.

23      Q.  Were you given anything in writing about those

24  rights?  Was anything given to you explaining your right

25  to have a hearing before the school board?

14

1       A.  No.

2       Q.  Was anything given to Andrew explaining that he

3   had a right to have a hearing before the school board?

4       A.  No.

5       Q.  Did anyone explain to you that under

6   Pennsylvania law of the school code, Andrew would've

7   been allowed to continue to attend classes up until the

8   school board hearing had occurred?

9       A.  No.

10          MR. FRANKHOUSER:  Objection.  One, it's an

11  inappropriate question.  Number two, it's inaccurate.

12  That's not what the State Board of Regulations state.

13          THE COURT:  Did you want to respond to that,

14  counsel?

15          MR. WINTER:  Yes.  I believe that is what the

16  regulation says, but I'm asking him specifically if he

17  had been told anything in respect to that.  Whether it's

18  accurate or inaccurate I leave it to you to make that

19  determination, but the question is was he told anything.

20          THE COURT:  You may answer the question yes or

21  no.

22          THE WITNESS:  I'm sorry, the question again?

23  BY MR. WINTER:

24      Q.  Were you told anything in relation to Andrew

25  potentially having a right to continue to attend school

15

1  up until the school board hearing occurred?

2      A.  No.

3      Q.  Okay.  At this hearing, did you waive Andrew's

4  right to further review of the case?

5      A.  No.

6      Q.  All right.  Sir, did you take actions after

7  that to attempt to resolve this situation?

8      A.  Yes, I did.

9      Q.  Okay.  And, in fact, you obtained legal

10 counsel; is that correct?

11     A.  Yes.

12     Q.  Okay.  And did you have that legal counsel

13 attempt to contact the school district?

14     A.  Yes.

15     Q.  And was that legal counsel able to resolve the

16 issue with the school district?

17     A.  No.

18     Q.  And when they were unable to do so, at that

19 point you retained my office, correct?

20     A.  Yes.

21         MR. WINTER:  Okay.  That's all I have for

22 Mr. Dissinger at this point.

23         THE COURT:  Cross-examination.

24                    CROSS-EXAMINATION

25 BY MR. FRANKHOUSER:

16

1      Q.  Mr. Dissinger, would I correctly identify you

2  as Detective Dissinger?

3      A.  Yes.

4      Q.  And you are a detective for the Manheim

5  Township Police Department, are you not?

6      A.  Yes.

7      Q.  So when you went to the high school in the

8  early morning of May 20th to see Officer Blantz, you

9  knew Officer Blantz, correct?

10     A.  Yes.

11     Q.  He's a co-employee of yours, correct?

12     A.  Yes.

13     Q.  Now, I want to be clear on various aspects of

14 your testimony.  I believe you just said to Mr. Winter

15 that you were told by Mr. Mayfield at the meeting of

16 Monday, May 21st, that Andrew would not be entitled to

17 participate in graduation, correct?

18     A.  That's right.

19     Q.  Okay.  Now, Detective Dissinger, did you review

20 the petition that was filed in this proceeding?

21     A.  Rough draft.

22     Q.  Okay.  And did you correct things that were

23 inaccurate?

24     A.  I had made some mention of it to the attorney.

25     Q.  So if the petition says that you were told

17

1  exactly the opposite, that would be incorrect, wouldn't

2  it?

3      A.  Exactly the opposite of what?

4      Q.  If the petition says that you were told that

5  Andrew would be able to participate in the graduation

6  ceremony, that would be inaccurate, wouldn't it,

7  Mr. Dissinger?

8      A.  Well, there are two -- there were two versions

9  of this.  The first version was the Saturday night when

10 I initially spoke with Mr. Mayfield, he had told me that

11 he would do everything that he could to make sure Andrew

12 graduates, you know, with his class.  Then when we had

13 the meeting on Monday, that was when he told me that,

14 you know, he would not be graduating with his class and

15 he's suspended for the rest of the year.

16     Q.  And to be absolutely clear, Detective

17 Dissinger, when you met with the Assistant Principal

18 Mayfield on Monday, May 21st, you knew that one of the

19 consequences of Andrew's actions was he was not going to

20 be able to participate in the graduation ceremony,

21 correct?

22     A.  I did not know that.

23     Q.  So I'm unclear.  When you testified to that

24 effect to Mr. Winter now, you were wrong?

25     A.  What I'm saying is that Mr. Mayfield made it

18

1  sound like Andrew -- Mr. Mayfield told me Saturday night

2  that Andrew would be --

3      Q.  I'm not asking you about Saturday night,

4  Detective Dissinger.  I'm asking you about Monday, May

5  21st, when you met with Mr. Mayfield in his office.

6          MR. WINTER:  Your Honor, Mr. Dissinger was

7  asked to explain his answer.  He was in the middle of

8  explaining his --

9          THE COURT:  The answer was unresponsive to the

10 question.  The question was specifically relative to

11 Monday.  It was not relative to Saturday.  So I think

12 the question is appropriate and you may continue,

13 counsel.

14         MR. FRANKHOUSER:  Thank you, Your Honor.

15         THE WITNESS:  On Monday, Mr. Mayfield told me

16 that Andrew would not graduate with his class.

17 BY MR. FRANKHOUSER:

18     Q.  Thank you.

19         Now, Mr. Winter asked you about the meeting

20 with Dr. Williams on Wednesday, the 23rd, correct?

21     A.  Yes.

22     Q.  And at one point in your answer, you said you

23 had the opportunity to cross the testimony of -- or the

24 statements of Mr. Mayfield?

25     A.  Dr. Williams told me.

19

1    Q. And then you changed your answer to say
2  question.
3        As a detective, you understand what
4  cross-examination is, don't you?
5    A. Yes.
6    Q. You've been cross-examined professionally, like
7  now, on multiple occasions?
8    A. Yes.
9    Q. You had that opportunity to cross-examine
10 Mr. Mayfield during the meeting in Dr. Williams' office,
11 correct?
12   A. I had the opportunity to cross-examine
13 witnesses.
14   Q. And so did your son, correct?  Correct?
15   A. Yes.  Yes.
16      MR. FRANKHOUSER:  Okay.
17      (Defendant's Exhibit Nos. 1 and 2 marked
18 respectively.)
19 BY MR. FRANKHOUSER:
20   Q. See if we can fill in some gaps, Detective
21 Dissinger.  I'm going to show you what's been marked as
22 Defendant's Exhibit Number 1.  Would you tell the Court
23 what that is?
24   A. Looks like a letter from Mr. Mayfield to us
25 about the -- that Andrew violated a policy of the school

20

1  district.
2    Q. Okay.  Bearing what date?
3    A. May 21st.
4    Q. And is that the letter that was handed to you
5  when you had the meeting in Mr. Mayfield's office on
6  Monday, the 21st?
7    A. I don't recall.
8    Q. Okay.  Do you recall if you received this then,
9  or if you received it in the mail at a later time?
10   A. I don't recall if I got this document in the
11 mail.
12   Q. You did receive it, however?
13   A. I don't know.
14   Q. You've never seen this before?
15   A. I've not seen this letter.
16   Q. All right.  That is your correct address, is it
17 not?
18   A. Yes.
19   Q. Take a look at Defendant's Exhibit Number 2.
20 Could you identify that for the record, please?
21   A. This is a letter from the assistant
22 superintendent, Dr. Williams, pretty much outlining the
23 superintendent's hearing that was held on May 23rd.
24   Q. Okay.  Have you seen this letter before?
25   A. Yes.

21

1    Q. How did you receive it?
2    A. Certified mail.
3    Q. So this came in the mail to you?
4    A. Yes.  Yes, sir.
5    Q. And would I be correct that the address in the
6  letter that you received, being Defendant's Exhibit
7  Number 2, is the identical one that is on Defendant's
8  Exhibit Number 1?
9    A. That is the correct address, yes.
10   Q. Am I correct, Detective Dissinger, that at the
11 meeting with Dr. Williams, you, your wife and Andrew
12 said we are not challenging the school district's ability
13 to suspend your son?
14   A. I don't recall saying that.
15   Q. All right.  You don't recall saying it.
16      Is it possible you did say it and you just
17 don't remember it today?
18   A. No.
19   Q. It's not possible?
20   A. I never said I'm stopping my challenge of -- I
21 -- I specifically asked Dr. Williams how I could further
22 appeal this process.
23   Q. Detective Dissinger, I'm going to be very
24 precise.  I want you to listen to me.  Okay?
25   A. I'm listening.

22

1    Q. Isn't it true that you told Dr. Williams that
2  you didn't want to challenge the suspension?
3    A. The suspension, that's true.
4    Q. Okay.  What you told Dr. Williams was you
5  wanted to appeal the consequence of the suspension so
6  that Andrew could walk in graduation, correct?
7    A. Yes.
8    Q. And that's all you ever asked to challenge,
9  correct?
10   A. No.
11   Q. What else did you ask?
12   A. I then -- I mean, maybe I'm confused what
13 you're trying to tell me.  I then told Dr. Williams I
14 wanted to appeal his decision to the school board.
15   Q. Now you confused me, Mr. Dissinger.  And you
16 were there, so I get to ask the questions.
17      You acknowledge you told Dr. Williams that you
18 didn't wish to challenge the suspension.  Are you now
19 changing your mind?
20   A. No.
21   Q. Okay.  The fact is apart from what you may or
22 may not have told Dr. Williams, the only thing you want
23 this Court to do is allow Andrew to walk in the
24 graduation ceremony this evening?
25   A. Is that a question?

23

1    Q.  Yes.

2    A.  Yes.

3    Q.  You don't want him to go back to school?

4    A.  Well, he can't go back to school.

5    Q.  Well, today was a school day.  You didn't want

6  him to go to school today, did you?

7    A.  I wanted him to attend the ceremonies, whatever

8  entails that.

9    Q.  Yesterday, which is Wednesday, was a school day

10  for seniors.  You didn't want Andrew to go to school

11  then, did you?

12    A.  Well, that was graduation practice, practice

13  graduation.  So, yes.

14    Q.  You wanted him to attend the practice, but not

15  go to school?

16    A.  Well, it clearly states that the practice is

17  mandatory for graduation.

18    Q.  Tuesday was a school day, was it not?

19    A.  I believe so.

20    Q.  It was?

21    A.  Well, I know the seniors have -- each class has

22  different days.  I mean, I don't know the ins and outs

23  of the school, but the seniors' class days end earlier

24  than the regular students.  So I'm not sure if Tuesday

25  was a class day for seniors or if it was a class day for

24

1  the entire school.

2        MR. FRANKHOUSER:  Fair enough, Detective

3  Dissinger.  That's all I have.  Thank you.

4        THE COURT:  Any redirect?

5        MR. WINTER:  Briefly.

6              REDIRECT-EXAMINATION

7  BY MR. WINTER:

8    Q.  Detective Dissinger, I just want to -- I want

9  to be very clear about the meeting with the

10  superintendent.  Were you given anything to sign at that

11  meeting?

12    A.  I don't remember signing anything.

13    Q.  Was your son, Andrew, given anything to sign,

14  to your knowledge?

15    A.  No.

16    Q.  Were you explained -- were you told that you

17  were giving up the right -- or your son was giving up

18  the right to challenge this before the school board at

19  any point?

20    A.  No.

21        MR. WINTER:  That's all I have for Detective

22  Dissinger.

23        MR. FRANKHOUSER:  No, thank you.

24        THE COURT:  You may step down.

25        Counsel, just as a reminder, I do have a

25

1  pretrial conference at 10:00 that will not last long.

2  My secretary's going to knock on the door.  I'll go off

3  at that point.  I just want to -- I'm going to go off

4  the bench briefly.  I want everybody to stay here.

5        Mr. Winter.

6        MR. WINTER:  Very good.  We're next calling

7  Andrew Dissinger.

8              ANDREW DISSINGER,
        called as a witness, being duly sworn or affirmed,
9          was examined and testified as follows:

10              DIRECT EXAMINATION

11  BY MR. WINTER:

12    Q.  Mr. Dissinger, what's your date of birth?

13    A.  4-22-94.

14    Q.  That would make you 18 years old, correct?

15    A.  Uh-huh.

16    Q.  And you are a senior at Manheim Township High

17  School?

18    A.  Yes, I am.

19    Q.  On May the 19th of this year, what was

20  occurring?

21    A.  Prom.

22    Q.  And where was the prom being held?

23    A.  Lancaster -- Downtown Lancaster Convention

24  Center, I believe.

25    Q.  All right.  And after the prom, was there an

26

1  after-prom party scheduled?

2    A.  Yeah.  Post-prom.

3    Q.  The post-prom party, where was that to be held?

4    A.  The high school.  Manheim Township High School.

5    Q.  Did you go to that post-prom party?

6    A.  Yes, I did.

7    Q.  When you arrived at the post -- or what time,

8  approximately, did you arrive at the post-prom party?

9    A.  I want to say, like, 11:30.

10    Q.  Okay.  11:30 p.m. on that night?

11    A.  Yeah.

12    Q.  What happened after you arrived there?

13    A.  I checked in.  Me and my girlfriend were in a

14  fight.  I guess parents came up to Officer Blantz and

15  said I was acting erratical, my behavior was off.  So he

16  pulled me over to the side, asked if I had been drinking

17  and I said no.  I walked -- I walked away and then

18  that's when Mr. Mayfield and Officer Blantz took me into

19  a room and that's when they asked me questions.

20    Q.  Okay.  Did they have you perform a portable

21  Breathalyzer at that point?

22    A.  Yes, they did.

23    Q.  Okay.  And when you were taken into this room

24  by the police officer and Mr. Mayfield, at that point

25  were you advised that you were free to leave?

27

1    A.  No.

2    Q.  Were you advised that you had the opportunity

3 to refuse to talk to them?

4    A.  No.

5    Q.  Were you read any type of Miranda Rights?

6    A.  No.

7    Q.  After that occurred, was your father called to

8 the post-prom?

9    A.  Yeah.

10    Q.  Okay.  What occurred when he got there?

11    A.  He talked to Officer Blantz and Mr. Mayfield

12 about what went on.

13    Q.  Okay.  And to the best of your recollection,

14 what was the conversation between your father and

15 Mr. Mayfield?

16    A.  They were just talking about what's going to

17 happen next; like, we have a meeting Monday morning and

18 that was it.

19    Q.  Do you recall was anything said in respect to

20 you being able to attend graduation on that evening?

21    A.  No.

22    Q.  You don't recall whether anything was said?

23    A.  No, they didn't say anything about that.

24    Q.  Okay.  All right.  So you attended the -- was

25 this meeting held on Monday?

28

1    A.  Yeah.  Yeah.  Yeah.

2    Q.  What happened when you attended the meeting on

3 Monday?

4    A.  We went into Mr. Mayfield's office and they

5 kind of, like, re-informed what happened that night, and

6 then that's when Mr. Mayfield said, like, I can't walk,

7 but, like, I can either have a hearing with the

8 assistant superintendent or -- or that's it.  Like, that

9 was it, basically.

10    Q.  Okay.  So, basically, you were told that you

11 could accept the suspension or go to the assistant

12 superintendent's --

13    A.  Yeah, and see if he will let me walk.

14    Q.  All right.  And you heard your father's

15 testimony as to what occurred at that meeting with

16 Mr. Mayfield on Monday?

17    A.  Yeah.

18    Q.  Okay.  Was he correct when he stated the people

19 that were present?

20    A.  Yep.

21    Q.  Was he correct when he said the circumstances

22 of where the meeting occurred and what the atmosphere

23 was?

24    A.  Mm-hmm.

25    Q.  Was there a second meeting?

29

1    A.  No.

2    Q.  Was there a meeting with the superintendent?

3    A.  Yeah, there was a second meeting with the

4 superintendent.

5    Q.  Okay.  And that would have been on Wednesday,

6 the 23rd?

7    A.  Yeah.

8    Q.  Did you attend that meeting?

9    A.  Yeah.

10    Q.  What occurred at that meeting?

11    A.  We -- again, like, they asked us to raise our

12 hand and then he -- Mr. Mayfield said, like, a

13 statement; and then Mr. Williams said a statement; and

14 then we could, like, judge that; go on, like, our side

15 of the story, basically.  And that's what happened at

16 that meeting.

17    Q.  Okay.  What happened at the end of that

18 meeting?  What did the superintendent say at the end?

19    A.  He just said our decision -- he said that our

20 decision, like, our -- it stands.  Like, I can't

21 graduate.  Like, I can't walk with my class and that was

22 it.

23    Q.  Okay.  What, if anything, were you told by the

24 superintendent or by Mr. Mayfield about taking this

25 matter before the school board?

30

1    A.  If I took it before the school board, I would

2 get -- I could have a chance of getting expelled, then I

3 won't get to graduate.  Like, my diploma.

4    Q.  At any point were you told that you were giving

5 up your right to have a hearing before the school board?

6    A.  No.

7    Q.  Okay.  Did you sign anything giving up your

8 right to have a hearing before the school board?

9    A.  No, I didn't.

10    Q.  Is it your wish to attend graduation this

11 evening?

12    A.  Yes, it is.

13    Q.  If you had the chance to return to classes and

14 finish out the remainder of the school year last week

15 and this week, would you have done so?

16    A.  Yes.  And I done so.

17    Q.  Were there plans for other members of your

18 family to attend graduation this evening?

19    A.  Yep.  My family, my grandparents, my aunts,

20 uncles.

21    Q.  Were some of them coming in from out of the

22 area?

23    A.  My grandma's coming in from New York.

24    Q.  Okay.  All right.  And is my understanding

25 correct that you still had finals to finish last week?

31

1    A. Yep, Tuesday and Thursday.  And I finished all
2  them.  That means we're done with school.
3    Q. And as far as you're aware, have you completed
4  all requirements to receive your certificate or diploma
5  from Manheim Township?
6    A. Yes, I have.
7    MR. WINTER:  Okay.  That would be all I have
8  for Mr. Dissinger.
9    THE COURT:  Thank you.
10   Cross-examination.
11   MR. FRANKHOUSER:  Thank you, Your Honor.
12                CROSS-EXAMINATION
13 BY MR. FRANKHOUSER:
14   Q. Let's pick up on that scene, Mr. Dissinger.
15   You took the finals that you needed on Tuesday
16 and Thursday, correct?
17   A. Correct.
18   Q. That was during the suspension period, correct?
19   A. Yep.
20   Q. And you were permitted to come back to school
21 specifically to take those finals, correct?
22   A. Yep.  Tuesday and Thursday.
23   Q. Mr. Dissinger, you were aware that the Manheim
24 Township School District had a code of conduct, were you
25 not?

32

1    A. Yep.
2    THE COURT: Mr. Dissinger, please yes or no so
3  she can take down your answer.
4    THE WITNESS:  Oh.  Yes.
5    THE COURT:  Thank you very much.
6  BY MR. FRANKHOUSER:
7    Q. You reviewed it?
8    A. Yes.
9    Q. It was reviewed with you and all of your
10 classmates at the beginning of the school year, was it
11 not?
12   A. Yes, sir.
13   (Defendant's Exhibit No. 3 marked.)
14 BY MR. FRANKHOUSER:
15   Q. Mr. Dissinger, I'm showing you what we've
16 marked as Defendant's Exhibit Number 3.  It's an
17 acknowledgement bearing your signature, is it not?
18   MR. WINTER:  I'll stipulate to the
19 admissibility of this document.
20   MR. FRANKHOUSER:  All right.  Thank you.  You
21 don't need to answer that.
22   THE WITNESS:  Thank you.
23
24 BY MR. FRANKHOUSER:
25   Q. In fact, there was a meeting that you attended

33

1  along with your senior student colleagues in April where
2  Assistant Principal Mayfield reminded all of you of the
3  consequences of violating the Code of Conduct
4  particularly as it related to seniors at the end of the
5  year, correct?
6    A. Yes, sir.
7    Q. And you were there, you heard Mr. Mayfield?
8    A. Yep.  Yes, I was there.
9    Q. He reminded you that there were consequences to
10 your actions, did he not?
11   A. Yes.
12   Q. And that one of those consequences could well
13 be the inability to walk with your class at graduation,
14 correct?
15   A. Yes, that was one.
16   Q. And one of the things that Mr. Mayfield said to
17 you and your senior colleagues in that reminder was use
18 of alcohol, correct?
19   A. Yeah.  Yes.
20   Q. So, Mr. Dissinger, let's get clear.
21   A. All righty.
22   Q. What happened on May 19th and May 20th?
23   If I remember the story, you were asked if you
24 had been drinking, and you told Officer Blantz no?
25   A. Yes.

34

1    Q. That wasn't true, was it?
2    A. Nope.
3    Q. Did you tell Mr. Mayfield in the early morning
4  hours of May 20th that you had drunk alcohol before
5  going to the post-prom?
6    A. Yes, I did.
7    Q. Okay.  What did you tell him and when?
8    A. Do you mean, like, there's -- what day?
9    Q. I'm asking you --
10   A. You said when.
11   Q. When you were in Mr. Mayfield's office the
12 early morning of Sunday, May 21st, did you tell
13 Mr. Mayfield that you had been drinking?
14   A. I did not say I'd been drinking.  I said that
15 Monday morning.
16   Q. The fact is, Mr. Dissinger, you told
17 Mr. Mayfield in the early morning hours of May 20th --
18   A. 20th.
19   Q. -- at the post-prom that you had not been
20 drinking?
21   A. Mm-hmm.
22   Q. Correct?
23   A. Correct.
24   Q. And when he suggested that he would bring
25 Officer Blantz to provide you with a field sobriety test

35

1  including a Breathalyzer, you volunteered to take that
2  test, didn't you?
3      A.  That's not true.  I didn't say -- I didn't say
4  so I want to take this test.  Like, I said if you
5  suggest me to take it, I'm going to say yes because I
6  didn't think I had any other option.
7      Q.  So they asked you to take the test?
8      A.  Yes.
9      Q.  And you did?
10     A.  Yes.
11     Q.  Now, Mr. Dissinger, as we sit here today --
12     A.  Mm-hmm.
13     Q.  -- the Manheim Township Police Department has
14  not charged you with any criminal offense including
15  underage drinking, have they?
16     A.  They've charged me with public drunkenness.
17     Q.  They charged you with public drunkenness?
18     A.  Mm-hmm.
19     Q.  And was that done by the Manheim Township
20  Police Department or the school district?
21     A.  Manheim Township Police Department.
22     Q.  And what is the status of that charge as we sit
23  here today?
24     A.  I currently don't know.
25     Q.  Okay.  Somebody else is taking care of that?

36

1      A.  Yeah.
2      Q.  Now, when you went to Mr. Mayfield's office on
3  Monday, May 21st, did you tell Mr. Mayfield that, in
4  fact, you had drunk alcohol before going to the
5  post-prom?
6      A.  Yes.  I said I had two sips of alcohol.
7      Q.  You said two sips?
8      A.  Yep.
9      Q.  Okay.  And what did you tell him you had to
10  drink?
11     A.  Some type of vodka.
12     Q.  Some type of vodka?
13     A.  Yeah.
14     Q.  Did that story change at all either on the 21st
15  or on the 23rd?
16     A.  No.
17     Q.  Did the volume of the alcohol that you
18  acknowledged consuming change at all?
19     A.  No, it didn't.
20     Q.  Okay.  Did you say, for example, that you had
21  four to five sips of alcohol?
22     A.  No.  I said I had two sips of alcohol.
23     Q.  How about 11 to 12?
24     A.  Oh, no.
25         MR. FRANKHOUSER:  That's all I have, Your

37

1  Honor.
2         THE COURT:  Any redirect?
3              REDIRECT EXAMINATION
4  BY MR. WINTER:
5      Q.  Sir, when you had the meeting with the
6  assistant principal on May the 21st, were any
7  representations, any promises made to you before you
8  started talking with him about what happened?
9      A.  No.
10        MR. WINTER:  Okay.  That's all I have.
11        THE COURT:  Anything further, Mr. Frankhouser?
12        MR. FRANKHOUSER:  I couldn't possibly improve
13  on that answer.
14        THE COURT:  You may step down.
15        THE WITNESS:  Thank you.
16        MR. FRANKHOUSER:  Your Honor, by my watch, it's
17  five of 10.
18        THE COURT:  I was going to say can you give me
19  a minute and let me just check with them.  Everyone just
20  remain here.  I don't think it's going to be long.
21        (Defendant's Exhibit No. 4 marked.)
22        (Plaintiff's Exhibit No. 1 marked.)
23        THE COURT:  Anything further from the
24  petitioner?
25        MR. WINTER:  Your Honor, at this point, there's

38

1  just a stipulation.  We've had -- or I've had
2  Plaintiff's Exhibit 1, which is the school disciplinary
3  code, marked, and we're stipulating that this is a true
4  and accurate copy of the school disciplinary code.  And
5  it will be admitted for the purposes of this hearing.
6         THE COURT:  Very well.  Counsel, you're in
7  agreement with that, I assume?
8         MR. FRANKHOUSER:  Yes, sir.
9         THE COURT:  If I'm not mistaken, that was also
10  part of the exhibit of the original petition?
11        MR. WINTER:  It was, just so there's no
12  confusion as to what's going to be considered by the
13  Court.
14        THE COURT:  Anything further then?
15        MR. WINTER:  No, sir.
16        THE COURT:  For the school district?
17        MR. FRANKHOUSER:  Your Honor, I have two
18  witnesses to testify.
19        I'm going to make a motion at this point that
20  the Court reject the petition for an injunction.  It
21  doesn't come close to the standards necessary.
22        It is painfully clear to me that the
23  petitioners, notwithstanding what they say in the
24  petition that they presented to you, had the informal
25  hearing that is required by the State Board of Education

39

1  Regulations. That was the meeting with Mr. Williams.
2  They had notice. In fact, they requested it.
3        They had a statement of the charges. That's
4  Defendant's Exhibit Number 1. They had the opportunity
5  to hear the testimony, and they actually engaged in
6  cross-examination. All of the fundamental elements and
7  due process existed and comes right out of their own
8  mouth.
9        They made a conscious volitional decision to
10  say we don't care about the suspension, the only thing
11  we care about is attending the graduation ceremony.
12  That is not a board function. That's an administrative
13  function.
14        They are coming to you today to ask you to do
15  something that they cannot ask for. I would suggest
16  that the Court has every opportunity to deny the
17  petition now and bring this matter to a conclusion.
18        THE COURT: Do you wish to respond, counsel?
19        MR. WINTER: Yes, sir.
20        Sir, what I'm handing up to you are the copies
21  of the relevant administrative code sections that were
22  recited throughout my petition. This is 22 Pennsylvania
23  Code, Section 12.6 and 12.8. These are the code
24  sections which have been codified under Pennsylvania law
25  which set forth the due process rights of my client in

40

1  relation to school administrative hearings.
2        First thing that I would point out to you is
3  that -- and, again, this all comes directly out of my
4  petition -- if you take a look at the disciplinary
5  policy for the school, it says that consumption of
6  alcohol is an expulsion -- makes expulsion possible.
7  It's on Page 15 in terms of the standard for what he
8  cited.
9        If you take a look at Regulation 12.6 -- or
10  Section 12.6, Section 12.6 states that where expulsion
11  is a possibility, which it clearly was in this case, a
12  formal hearing is required under the law. It says --
13  Section 12.8 says, a student is entitled to a formal
14  hearing. And it's painfully clear that a formal hearing
15  did not occur in this case.
16        If you take a look at 12.9 and I believe it's
17  (b), they go through -- and there's a list of
18  approximately 10 different requirements that are
19  required for a formal hearing to occur, for a formal
20  hearing to occur, there must be written notice provided
21  at least three days in advance. There was no written
22  notice, nothing provided at least three days in advance
23  in this case.
24        The matter must be recorded in some way. This
25  matter was not recorded in any way. There must be a --

41

1  there must be a hearing at the school board or a
2  designated hearing examiner. There's no evidence this
3  occurred before a school board or a designated hearing
4  examiner.
5        So based right there, we have three significant
6  deficiencies in terms of the procedure that was
7  followed.
8        Now, I believe what the school district is
9  suggesting that what actually occurred here was an
10  informal hearing rather than a formal hearing. Well,
11  that's not what is provided for in the Pennsylvania
12  Code.
13        Where expulsion is a possibility, it's to be a
14  formal hearing as opposed to an informal hearing. Even
15  if we consider that the informal hearing in this case
16  somehow would say the general due process concept that
17  is required here, an informal hearing still requires
18  written notice in advance of the case. And you'll see
19  in the Mifflin County case I provided to you, Your
20  Honor, written notice was not provided. And in that
21  case, the Court of Common Pleas in Mifflin County found
22  a due process violation, an injunction was appropriate
23  and granted the injunction.
24        So I don't believe due process requirements
25  have been met. I believe there's a prima facie case for

42

1  an injunction, and I would ask the Court not to -- or to
2  deny opposing counsel's motion.
3        THE COURT: With regard to the motion, I'm not
4  ruling on it. I'd like to hear from the school board --
5  not the school board, from the school representatives.
6  However, I understand both positions relative to the
7  motion and may result in -- the end result may be as a
8  result of the motion; however, I'd like to hear from the
9  members of the school district.
10        MR. FRANKHOUSER: Understand. Thank you, Your
11  Honor.
12        Mr. Mayfield.
13              SHANNON MAYFIELD,
14      called as a witness, being duly sworn or affirmed,
          was examined and testified as follows:
15        MR. FRANKHOUSER: You've completed your case?
16        MR. WINTER: Yes.
17              DIRECT EXAMINATION
18  BY MR. FRANKHOUSER:
19        Q. Mr. Mayfield, would you give us your full name,
20  please.
21        A. Shannon Mayfield.
22        Q. By whom are you employed?
23        A. Manheim Township School District.
24        Q. In what capacity?
25        A. Assistant principal.

43

Q. Would you give Judge Knisely a brief rundown of your professional background?

A. Prior to being assistant principal, I served five years as a Georgia State Patrolman First Class; and after that duty, I was a United States Air Marshal dealing with counter-terrorism dealing with the Ronald Reagan -- with the Ronald Reagan administration. That was four years. And then I went into education as a mathematics teacher and urban education, progressed into administration, which is where I've been ever since.

Q. Do you currently hold certificates issued by the Pennsylvania Department of Education?

A. Yes, I do.

Q. What certification do you hold?

A. I have the K-12 principal certification and administration principalship.

Q. For how long have you been employed as the assistant principal at Manheim Township High School?

A. Three years.

Q. Where were you on Saturday, May 19th?

A. I was on the campus of Manheim Township High School.

Q. Where did the evening start on the 19th?

A. The evening started at the Lancaster Convention Center Marriott Hotel.

44

Q. And what event occurred there?

A. That was the senior prom for the class of 2012.

Q. And for whom is the senior prom held?

A. The senior prom's held for the graduating class or the seniors of 2012 and for invited guests per the students of that class.

Q. And is that a school district function?

A. It is a school district function.

Q. At the conclusion of the prom event, what is the next event in the evening agenda?

A. The next event scheduled was the senior post-prom.

Q. Okay. And what is the post-prom?

A. The post-prom is an event pretty much scheduled and proctored by the parents of the senior class of 2012. It is hosted on the high school campus.

Q. Okay. So that's on the school district property?

A. It's on school district property.

Q. Now, let's focus on the post-prom particularly as it related to Andrew Dissinger. Were you present at the post-prom?

A. I was present at the post-prom.

Q. Why are you there?

A. Well, all of the administrators work

45

post-prom. I had the first three-and-a-half to four years of the post-prom event; and we're there to support, to supplement, to provide assistance as necessary to the parents that are actually running the event.

Q. How did Andrew Dissinger come to your attention?

A. I was initially contacted by our school resource officer while I was actually filtering around, milling around through the event, and Officer Blantz indicated to me that we're going to have to check the student out.

Q. Now, Officer Blanton is the school resource officer?

A. Officer Blantz.

Q. Blantz. I'm sorry.

A. Yes.

Q. Who employs Officer Blantz?

A. Officer Blantz is employed by the Manheim Township Police Department, and he is assigned to the Manheim Township School District as the school resource officer.

Q. Now, Officer Blantz told you what?

MR. WINTER: Objection. Hearsay.

MR. FRANKHOUSER: It's not to prove the truth

46

of the matter asserted. It's used to set the context of Mr. Mayfield's actions and reactions.

THE COURT: Objection overruled.

THE WITNESS: Repeat the question.

BY MR. FRANKHOUSER:

Q. You may answer.

What were you told by Officer Blantz?

A. Officer Blantz approached me and said we need to check Andrew Dissinger out; I've got a lot of -- I've had a lot of comments made to me by several of the parents. And I said, okay, let me locate where he is, which I had to walk around the facility within this confined area. Where we were was in the cafeteria.

Once I identified Andrew, I approached and gestured to Andrew to come with me, I -- we need to talk. I have a safety and security issue we need to discuss.

Q. Was that your first interaction with Andrew Dissinger?

A. That was my first interaction at that particular point, yes.

Q. Did you know Andrew Dissinger from before the prom and post-prom?

A. Yes, I did.

Q. You're familiar with him as a student?

47

1    A.  I'm familiar with him as a student.

2    Q.  What did you do when you took Andrew out of the

3    post-prom?

4         First of all, where did you go and what did you

5    do?

6    A.  Well, I approached Andrew.  He was sitting at

7    one of the booth sections in the cafeteria and I

8    actually gestured to him.  I said, Andrew, I need to

9    speak to you.  You need to come with me.  And he got up,

10   cooperated and walked with me.  We walked away from the

11   cafeteria a short distance to Classroom 173, a remote

12   area away from the main activity, away from the main

13   events that were taking place.

14        We went into Classroom 173, and the first thing

15   I did was make sure we were fine because a lot of the

16   rooms' air-conditioning are shut down in the evenings.

17   So once I saw that this room was fine, it was

18   comfortable, we walked right in.

19        We took seats.  He sat in a chair, I sat in a

20   chair across from him and I asked him, you know, how are

21   you doing?  What's going on?  I have some safety

22   concerns we need to address.  I said, there have been

23   some complaints about your behavior and some of the

24   things going on this evening.  And the conversation

25   started from there, at which he answered a few questions

48

1    and we went through a progression of things.

2    Q.  Did it appear to you that he was different than

3    what you know of Andrew from before the prom and

4    post-prom?

5    A.  I noticed -- I noticed a little bit, but I

6    wasn't quite certain of what activities he had been

7    involved in that evening, so I wasn't sure of what his

8    general presentation at that particular point was all

9    about.  You know, we had a lot of kids doing a lot of

10   things.  But I did notice a couple of things that made

11   me want to go a little bit further just to make sure

12   that we were okay.

13   Q.  Okay.  And what were those things that you

14   noticed that drew your attention?

15   A.  Well, initially his face was a little redder

16   than normal.  Again, I couldn't determine if he had been

17   in dodge ball, if he had been in any particular events

18   that would cause that to happen.  His conversation was

19   emotional, you know, not yelling and screaming.  He was

20   cooperative, but you could see he was visibly upset

21   about something and it was a little bit of upset, then

22   he was fine.

23        We talked about various different things.  I

24   did ask him -- I did ask him through the course of this

25   conversation, I said, Andrew, you know, I want to make

49

1    sure you understand we are checking you out because we

2    had some complaints.  This is a safety and security

3    issue.  And I did at one point ask him, I said, look,

4    have you been drinking?  And his response was -- to me

5    was, no, I haven't been drinking.  I'm okay.  I'm fine.

6         His biggest concern then was he had a situation

7    with his girlfriend and it had gotten emotional and he

8    was visibly upset and shaken by that.

9    Q.  Okay.  What happened next?

10   A.  After we continued a little bit of the

11   conversation, I suggested to Officer Blantz, who had

12   accompanied us -- he was behind me -- I said, Officer

13   Blantz, I would like to be clear and safe.  Can we do a

14   field sobriety test on the spot?

15        And Officer Blantz said, yes.  I can get a unit

16   up here for that.

17        Well, at this point, Andrew restated, I haven't

18   been drinking.  I'm fine.  I'm okay.  He said, I'm fine

19   with it.  I don't have anything to hide.  I'll do it.

20   You know, I'm 18.  I'm grown.  I'm fine.

21   Q.  Okay.  So what occurred?

22   A.  Officer Blantz at that point -- I don't know if

23   he used his phone or if he went out and called from a

24   different location.  I thought he used his cell phone to

25   call and asked for the field sobriety test to be brought

50

1    to Room 173.  About 15 minutes or so later, Officer Neff

2    from the Manheim Township Police Department showed up.

3         It appeared he calibrated the unit in front of

4    me or cut it on.  I'm not sure exactly what he did.  He

5    cut it on, walked over to Andrew.  He walked over to

6    Andrew and explained to Andrew what he wanted done for

7    this test, and Andrew complied.  And after the test was

8    rendered, the determination was, was he blew a .04.

9         MR. WINTER:  I'm going to object at this point

10   to any results of the test.  Number one, he did not

11   administer the test.  The results of the test would be

12   hearsay in that regard.  And, number two, portable

13   Breathalyzer test results are not admissible in a

14   Pennsylvania court.  They're unreliable.

15        THE COURT:  I'm extremely familiar with the

16   breath tests on the criminal side and civil side and

17   know when they can and cannot be used.

18        Without giving the result, you may go on with

19   the question.

20   BY MR. FRANKHOUSER:

21   Q.  I'm not interested in the result, in the

22   precision of the result.  Did it, however, indicate that

23   he had consumed alcohol?

24   A.  After the test was administered, the indication

25   was alcohol had been consumed.

51

Q. What occurred next?

A. After that I said, Andrew, you have to come with me. We're going to go up front.

So we actually left out of the rear of Classroom 173 and navigated ourselves up to the main office -- into the main area of my office and then into my office. At that point in time, I advised Andrew that I would be contacting a parent, and we did. Officer Blantz had a very accurate number he could get the parent on. He made the phone call. Andrew and I went into my office and when his dad arrived at the school, we then proceeded with that particular portion, which was to explain to the parent what had transpired that particular evening.

Q. And what did you explain to Detective -- did you know that Mr. Dissinger was a Manheim Township detective?

A. I didn't know at that time. I was informed -- I was informed shortly after he had arrived. I didn't know that, the history.

Q. What did you tell Detective Dissinger?

A. Well, I explained to him that we had an issue on campus. I explained the progression, why I contacted his son; and after we contacted his son, the element of what appeared to be a violation of our policy involving

52

alcohol. I explained to him that he would be suspended at that time, but I didn't have the result then.

We sat in my office and we didn't go into a lot of details because at this particular point, Andrew was emotional and he wanted to say his side of it.

Now, I asked -- at this point, now, it's Detective Dissinger, I asked him, do you want your son to say anything else? And he said, no. Andrew wanted to say his side and his dad told him no. Shut up.

We concluded the meeting, and I did advise him that, look, we need to meet on Monday at 9:00 in my office.

Q. At any time during the early morning hours of May 20th, did you discuss Andrew's ability to participate in graduation ceremonies at all under any circumstances?

A. We didn't discuss any of those particulars on that particular morning, no.

Q. What happens next?

A. Well, the next thing after -- on that evening, we're talking on the Monday when we met?

Q. Now, I've put in front of you a document marked Defendant's Exhibit Number 4. Can you tell us what that is?

A. This is the report of incident that I had to

53

put together.

Q. And when did you prepare it?

A. I actually prepared this about 5 a.m. on the 20th.

Q. So that would be Sunday morning at the end of post-prom?

A. This would have been at the end of post-prom.

Q. And at any point, did you hand this document to Andrew or his parents?

A. This particular document was not given to the parents.

Q. Okay. Let's go to Monday, May 21st. What happens?

A. About 9 I was given a call that the Dissingers had arrived. I went out into the main office and greeted them both and brought them into my office.

As they were coming in, Officer Blantz was trailing in as well, and all of us met in my office that morning. And at that time, I advised of the policy that was violated, the --

Q. What was the policy that was violated?

A. Well, we had a violation of policy -- School Board Policy 218.

Q. Would you explain that to the Court?

A. School Board Policy 218 is a conduct policy

54

involving the use of illegal substances and/or alcohol, and it is a policy that we follow in the administering of consequences for all of our students in the district for school -- for students that are part of the athletics programs, for certain clubs and activities as well as for students with driving privileges on the campus.

Q. So what did you explain to Andrew and his parents on the 21st?

A. I explained to Andrew and his father that based upon the actions from the post-prom event, that Andrew would be suspended from school for the remainder of the year. He would forfeit his privileges -- activities and privileges and extracurriculars which at that particular point based upon the policy, it says for 60 days.

I also advised the dad that -- and Andrew that there would be an opportunity to discuss this further or to challenge this further, but it wouldn't be at the school level. I did indicate to them at that time that graduation ceremonies would also be suspended based upon this policy.

Q. Okay. And what did the Dissingers say to you?

A. The dad did most of the talking. He was very disappointed by it. He was very upset about it. He did want to know right away how to appeal this, and I

55

explained to him that this is the procedure and this is
how it would go.  I explained each stage of the process
to him by advising him that it would be next at the
district level; and if it's going to go further than
that, it would go from the district level to the school
board.

Q.  So how did the meeting conclude?

A.  There was another document.

Q.  Take a look at Defendant's Exhibit Number 1.
Should be -- you got it right in your hand, sir.

A.  This is the one from the --

Q.  Go ahead.  Go ahead, Mr. --

A.  The meeting concluded with Mr. Dissinger -- I
did ask him for his cell phone number because he wanted
to challenge it.  He said he was going to challenge it
and he wanted to be contacted about this hearing that
would take place at the district office.  So I did ask
him for his cell phone number in order for that contact
to be made immediately and as soon as possible for that
to be scheduled --

Q.  Okay.

A.  -- the meeting concluded.  He did have
conversation with Officer Blantz briefly after that and
then they exited the building.

Q.  Now, I've put in front of you Defendant's

56

Exhibit Number 1.  That's a letter dated May 21 with
your signature on it, I gather?

A.  Yes.

Q.  Was that sent or was that handed to the
Dissingers?

A.  I believe this particular letter here was
mailed home to them.

Q.  Okay.  On the date indicated?

A.  It was mailed on that particular -- on the May
21st date, yes.

Q.  And would that have been sent by you after your
meeting with them the morning of May 21st?

A.  Yes, this would have been sent.

Q.  Now, I understand a superintendent's hearing
was set up with Assistant Superintendent Williams?

A.  Yes, it was.

Q.  When did that occur?

A.  This meeting occurred on May the 23rd.

Q.  Where did it occur?

A.  It occurred in the district office.

Q.  Okay.  And Dr. Williams was presiding as the
assistant superintendent?

A.  Yes, he was.

Q.  Tell me what you remember occurring.

A.  Well, once we all collected in the meeting

57

room, the first thing we did was listen to a brief
presentation from Dr. Williams outlining the format of
this hearing, the process that this hearing would
involve, and then anyone and any party that was going to
present in this hearing had to stand up and take an
oath.  He did encourage the parents to stand up and do
that as well if they were going to have any questions or
any part of the process.

Q.  Okay.  What happened then?

A.  He gave them an opportunity to ask any
questions prior to us proceeding through the
proceedings, and there were no questions.  At that
particular point, I had to give my statement.

Q.  Okay.  So you presented, essentially, the
building's side of the events?

A.  I, basically, presented my Report of Incident,
yes.

Q.  Okay.  Did Andrew or his father question you
after your presentation?

A.  There were some questions after my
presentation.

Q.  Who asked them, by the way?

A.  Detective Dissinger did most of the
questioning.

Q.  Okay.  Did Andrew as well?

58

A.  Andrew made a couple of statements, not
necessarily questions.

Q.  Okay.  After you concluded your presentation
and the questions asked of you, were the Dissingers
given the opportunity to tell their side of the story?

A.  Yes, the Dissingers were able to state several
things at that particular hearing.

Q.  What was -- what did Andrew say?

A.  Andrew indicated that he knew me and that he
wanted to be straight up with me at the time.  At this
particular point, he was frustrated and upset of what
inevitably had happened.  He indicated that he tried to
explain some of his conversation that evening that we
had.  That's the best that I can remember from what he
said to me.

Q.  Did he acknowledge that he had consumed alcohol
before coming to the post-prom?

A.  As I recall, he did say he consumed some; I
don't remember how much.

Q.  Did he indicate to you why he was not honest
with you when he told you on the early morning hours of
the 20th that he had not consumed alcohol?

A.  No.

Q.  What was the conclusion of the session with
Dr. Williams?

59

1      A.  The conclusion was rather -- it was a
2  disappointing conclusion.
3      Q.  Disappointing how?
4      A.  The Dissingers were visibly upset and
5  frustrated by it.  Detective Dissinger was particularly
6  frustrated with the school policy and the inflexibility
7  of what the consequences that were rendered.
8      Q.  Did you understand the Dissingers to want their
9  child to go back to school?
10     A.  One of their primary concerns was the
11 graduation.  We didn't discuss him coming back to
12 school.
13     Q.  Did anybody ever say that Andrew would not
14 receive a diploma in any fashion?
15     A.  To the contrary.
16     Q.  Okay.
17     A.  We made it clear.
18     Q.  What did you make clear?
19     A.  What was made clear was he would graduate, he
20 would get his diploma, but he would not take part in the
21 graduation ceremony.
22     MR. FRANKHOUSER:  Cross-examine.
23     MR. WINTER:  If I may approach, Your Honor?
24     THE COURT:  You may.
25

60

1                    CROSS-EXAMINATION
2  BY MR. WINTER:
3      Q.  Sir, I'm showing you what's been marked as
4  Plaintiff's Exhibit 1.  Do you recognize that document?
5      A.  Yes.
6      Q.  What is that document?
7      A.  This is the Manheim Township School District
8  Code.  Of Conduct -- Student Code of Conduct.
9      Q.  Okay.  And I believe that -- you had mentioned
10 that there were two violations that Andrew had been
11 accused of?
12     A.  Yes.
13     Q.  Okay.  And one of those -- could you take a
14 look at Page 15.  Would one of those be a violation of
15 Number 227?
16     A.  One of them is a violation of 227.
17     Q.  Okay.  And is 227 set forth on Page 15 of that
18 document?
19     A.  Yes, it is.
20     Q.  Okay.  And, additionally, you had mentioned a
21 218.  I'm asking you to take a look at Page 22 of that
22 document.  I believe it's actually 218.4.
23     A.  218.4.
24     Q.  Okay.  Is that the 218 you're referring to
25 there on Page 22?

61

1      A.  Yes.
2      Q.  Okay.  Flipping back to Page 15, pursuant to
3  Policy 227, is expulsion a possibility for a drug and
4  alcohol offense?
5      A.  Is expulsion a possibility?
6      Q.  Yes.
7      A.  It is a possibility.
8      Q.  All right.  And that's set forth in the 227
9  that you referred to?
10     A.  As outlined in 227, yes.
11     Q.  Correct.  Okay.
12         All right.  Sir, as a school administrator, are
13 you familiar with informal and formal hearings as set
14 forth under the Pennsylvania Code?
15     A.  Yes.
16     Q.  Okay.  And in this case, do you believe that an
17 informal hearing occurred in relation to Mr. Dissinger?
18     A.  Yes.
19     Q.  Okay.  Do you believe that a formal hearing
20 occurred in relation to Mr. Dissinger?
21     A.  Yes, I do.
22     Q.  Okay.  And you're aware of the requirements for
23 each?
24     A.  Yes.
25     Q.  Okay.  So, sir, you're aware that for an

62

1  informal hearing, a student has a right to be given
2  advance written notice of the hearing?
3      A.  Yes.
4      Q.  Was advance written notice provided to
5  Mr. Dissinger?
6      A.  No.
7      Q.  Sir, are you aware that the -- in relation to
8  formal hearings, are you aware that for a formal
9  hearing, a student is to be notified in advance of the
10 hearing by certified mail of the charges?  You're aware
11 of that?
12     A.  Yes.
13     Q.  Okay.  In your opinion, in your consideration,
14 when did the formal hearing occur?
15     A.  The formal hearing took place at the district
16 office.
17     Q.  Okay.  That was the hearing on Wednesday, the
18 23rd?
19     A.  That was Wednesday, the 23rd.
20     Q.  Okay.  So, to your knowledge, was notification
21 of the charges sent to Mr. Dissinger or his parents by
22 certified mail in advance of Wednesday, the 23rd?
23     A.  I can't answer if it was sent by certified
24 mail.
25     Q.  Okay.  But to your knowledge, as far as you

63

1 know, it was not?

2     A. To my knowledge, I know he was notified.

3     Q. Okay.

4     A. I don't know about the certified mail piece.

5     Q. Okay. And by notified, are you referring to

6 Defendant's Exhibit 1, the letter that you had done on

7 May 21st? Is that what you're referring to?

8     A. No. I'm actually referring to the direct

9 communication that Mr. Dissinger had with Miss Criniti,

10 at the district -- C-r-i-n-i-t-i, at the district

11 office.

12     Q. Okay. But as far as you know, there was not

13 written notice provided to the -- prior to your saying

14 it was verbal notice, but not written notice?

15     A. I don't know all of the communication that

16 would have taken place. I do know communication took

17 place.

18     Q. Okay. And you're aware of the formal hearing

19 requires at least three days' notice?

20     A. Yes.

21     Q. Okay. And in this case, obviously, there was

22 not three days' notice provided?

23     A. In this case.

24     Q. Okay. You're aware that a formal hearing is

25 supposed to be recorded in some way.

64

1     Was a formal hearing -- in this case, was an

2 audio record, was there a court reporter present for

3 that hearing?

4     A. No.

5     Q. Okay. And, sir, you're aware Andrew's legally

6 an adult?

7     A. Yes.

8     Q. Okay. Did you have personal communications

9 with him since he's an adult?

10     A. Did I have personal communication with him?

11     Q. Mm-hmm.

12     A. I did.

13     Q. Okay. And did you notify him of these

14 hearings?

15     A. Andrew was informed of the process on the

16 morning that we all met to -- collectively together in

17 my office.

18     Q. Okay. In relation to your letter of May

19 21st -- I believe it's Defense Exhibit 1, this one

20 here. You've identified that?

21     A. Yes.

22     Q. Okay. You said you thought that letter was

23 mailed out?

24     A. Yes.

25     Q. Okay. To your knowledge, was that letter sent

65

1 by certified mail?

2     A. I don't know if it was sent by certified mail

3 or not.

4     Q. Okay. You personally mail out letters that you

5 send out from your office or do you assist the secretary

6 or someone like that?

7     A. We have administrative secretaries, yes.

8     Q. You didn't personally send this out?

9     A. I generated the letter and it was mailed from

10 the office. I didn't personally mail it myself.

11     Q. Okay. So for all you know, there could've been

12 a mistake or error somewhere down the road and it may

13 never have reached the Dissingers because it wasn't sent

14 certified, right?

15     A. I have no idea. I don't know.

16     Q. Okay. All right.

17     Sir, you also said you're aware that Andrew is

18 an adult?

19     A. Yes.

20     Q. Why in your letter did you address the letter

21 to Andrew's parents when he's legally an adult and these

22 are his rights involved in this case?

23     A. On Saturday evening when we initially met, I

24 did advise Mr. Dissinger that Andrew had FERPA on file

25 in our school district and at that particular point,

66

1 Andrew and his dad both agreed -- Andrew said, no, I

2 don't have a problem with my dad being part of this

3 process. At that point, on Saturday evening it was

4 disclosed verbally to me because I informed him that

5 Andrew has FERPA on file with us.

6     Q. For the record -- you've already spelled it --

7 if you could just explain that for the record? What's a

8 FERPA?

9     A. Well, the FERPA, once the student reaches 18,

10 if -- unless they waive their right, any contact and any

11 communication and any dealings with them from the

12 school's perspective has to go straight through the

13 student. You would not have any contact at all with the

14 parent.

15     Q. Okay.

16     A. And at the point that this was determined,

17 which I determined it before Mr. Dissinger had arrived,

18 I disclosed that to them then. But at that particular

19 meeting, Andrew said, no, I don't have any problems with

20 you talking directly to my dad and communicating with my

21 dad.

22     Q. Okay. Very good.

23     But still you did not send the letter to

24 Andrew?

25     A. Did not send it to Andrew.

67

1    Q. Okay. Sir, you talked a little bit about the
2  procedure that the school district uses, which
3  was basically, a hearing before yourself -- informal
4  hearing before yourself, a formal hearing with the
5  superintendent, and then a hearing before the school
6  board. Is that essentially the procedure?
7    A. Those are the procedures.
8    Q. Okay. Where was that procedure documented?
9    A. Where would that procedure be documented?
10   Q. Where is that procedure documented?
11     If I'm a parent and I want to look up that
12 procedure, where would I go to look for it?
13   A. You would look that up in the school district's
14 website under the Student Code of Conduct.
15   Q. Okay. You got the Student Code of Conduct in
16 front of you. I didn't find it in there, but if you can
17 show me where it is, I'd appreciate that.
18   A. I'm not able to identify it.
19   Q. Okay. So the policy in relation to the appeals
20 procedure for a parent or a student from what you're
21 saying is not in the Code of Conduct?
22   A. No.
23   Q. Okay. At the formal hearing with the
24 superintendent, were the Dissingers informed of their
25 right to have this matter heard by the school board?

68

1    A. Yes.
2    Q. Okay. Was that notice given to them in writing
3  in any way?
4    A. I don't recall if it was given to them in
5  writing.
6    Q. Okay.
7    A. It was outlined by Dr. Williams.
8    Q. Okay. Sir, Andrew met with you and the school
9  resource officer in the early morning of the 20th,
10 correct?
11   A. Correct.
12   Q. Okay. And at the time he met with you, you and
13 the school resource officer talked to him about what had
14 occurred; is that fair?
15   A. That's fair.
16   Q. Okay. And at any point, was Andrew told that
17 he did not have to talk to you?
18   A. I don't recall that he was told that he didn't
19 have to talk to us.
20   Q. Andrew was taken to a separate location from
21 the rest of the students to talk to, correct?
22   A. He was taken to Room 173.
23   Q. Okay. Was Andrew at any point told that he was
24 free to refuse this Breathalyzer test that you asked him
25 to do?

69

1    A. Before we even had an opportunity to tell
2  Andrew this, when I said -- when I suggested out of
3  safety that I'm going to request that you take a field
4  sobriety test, Andrew said, no problem. I'm 18. I'm
5  grown. I'll take it. I don't have anything to hide.
6    Q. Okay. And when you separated Andrew from the
7  rest of the students with the police officer, was he
8  Mirandized in any way? Was he advised of his legal
9  rights?
10   A. Andrew wasn't arrested. No.
11     MR. WINTER: Okay. I have nothing else at this
12 time, Your Honor.
13     THE COURT: Any redirect?
14     MR. FRANKHOUSER: Nothing, Your Honor.
15     THE COURT: You may step down, sir.
16     MR. FRANKHOUSER: Dr. Williams.
17         TIMOTHY P. WILLIAMS,
        called as a witness, being duly sworn or affirmed,
18        was examined and testified as follows:
19         DIRECT EXAMINATION
20 BY MR. FRANKHOUSER:
21   Q. Dr. Williams, would you please give your full
22 name for the Court?
23   A. My name is Timothy Paul Williams.
24   Q. And where are you employed?
25   A. Manheim Township School District.

70

1    Q. In what capacity?
2    A. Assistant to the superintendent for secondary
3  education.
4    Q. Give the Court a brief rundown of your
5  professional background.
6    A. Early in my career, I was a middle school --
7  English and Social Studies teacher for the middle school
8  level and moved into the technology end of things for
9  school districts -- Penn Manor, then Manheim Township --
10 then moved into administrative positions over the years,
11 and the last two years have been assistant to the
12 superintendent.
13   Q. What are the functions and duties of the
14 assistant to the superintendent of the Manheim Township
15 School District?
16   A. It runs the gamut from everything to curriculum
17 and instruction to supervising principals to holding
18 hearings for students who have disciplinary infractions,
19 which is the least pleasant part of my job.
20   Q. Who is the superintendent of the school
21 district?
22   A. Dr. Gene Freeman.
23   Q. You held what's commonly known as the
24 superintendent's hearing for Dr. Freeman, correct?
25   A. Correct.

71

Q. Where was Dr. Freeman at the time?

A. Dr. Freeman was out of the country at the time.

Q. Okay.  How does Andrew Dissinger come to your attention?

A. I received a dreaded phone call the first day of school after prom and post-prom because typically every year, there's some issue like this, and Mr. Mayfield ran through the -- what had happened, and we talked about he would have the option for a superintendent's hearing or a formal hearing with the school board.

Q. Now, would you explain to the Court the difference between the two?

A. Well, the formal hearing with the school board is a recorded process.  Many things that were talked about in the courtroom today about the process for a formal hearing, that's where they would transpire with school board members presiding.  And someone with this kind of infraction has the option to do the formal hearing with the school board or -- where they can be expelled and likely would be for an infraction of that policy, or they may choose the informal hearing, which we call a superintendent's hearing.

Q. And what is the advantage to a student to electing the superintendent's hearing?

72

A. Most students wisely elect a superintendent's hearing because I do not have the authority to expel anyone, only the school board would have that authority.  So that is not an option that I can disseminate as a disciplinary action.

Q. So you conducted a superintendent's hearing on Wednesday, May 23, correct?

A. That is correct.

Q. Who was in attendance?

A. In attendance was Andrew and Detective Dissinger, Mrs. Dissinger and Mr. Mayfield.

Q. Did you understand there was some need for expeditiousness by the Dissinger family?

A. Yeah, it certainly seemed that way to me because originally we tried to schedule it for the following week and they --

Q. Which would have been early this week?

A. Correct.  That's correct, because my calendar was kind of packed at that point and then the Dissingers requested sooner, so we shifted some things around to accommodate them on the 23rd.

Q. Okay.  So what happens on the 23rd?

A. Twenty-third at I believe it was 4, the Dissinger family comes in.  First thing I say to them is before we even get started, before I even sit down, I

73

said, this is a wise choice.  Making this choice is a wise choice because this will not cause an expulsion.

Q. Okay.  Now, what would be the consequence of an expulsion had the Dissingers elected a board hearing and had as a result of that hearing the board chosen to expel?

A. Andrew would not graduate with a Manheim Township diploma.

Q. So we're not -- the consequence of that event would not simply be unable to participate in the ceremony, it would be not receiving a degree?

A. Correct.

Q. Why is that?

A. Because he would no longer be one of our students at that point.

Q. All right.  Now, who was in attendance for the Dissingers?

A. Just the Dissingers themselves, the three Dissinger family members.

Q. Okay.  That would be father, mother and Andrew?

A. Correct.

Q. As a result of your explanation of their options, what decision did the Dissingers make?

A. Well, since they asked -- since we had the hearing scheduled for the 23rd for the superintendent's

74

hearing, it was a superintendent's hearing.

Q. Okay.  What happened?

A. At the hearing itself?

Q. Yes, sir.

A. Well, there's a formal process we go through and I read a script.  And I say this to -- every hearing I ever do we have to follow this script, and part of that script is giving everybody an opportunity to have input and a conversation.  And that's the word I use a lot.  We have a conversation about the events that happened.  So in that script, part of that script is raising your right hand and swearing to tell the truth, the whole truth and nothing but the truth.  And that was part of that hearing.

Then Mr. Mayfield presents the administration's case and then the Dissinger family.  First the student, Andrew, has an opportunity to make a statement, and then the family members themselves have an opportunity to make a statement as long as they took the oath and they did, so that was perfectly fine.  And there was some conversation and Mr. -- Detective Dissinger did cross-examine Mr. Mayfield more heavily than I've ever seen a family member cross-examine district's witnesses ever before.  I was somewhat taken aback by that, but I understood the situation and I allowed it because he has

75

the opportunity to cross-examine the witness and
Mr. Mayfield was the only witness we presented that
day.

Q. Okay. So Detective Dissinger elected to
utilize that opportunity that he has, correct?

A. That is correct.

Q. Did Andrew present to you his side of the
story?

A. In bits and pieces, yes, he did.

Q. Well, let's focus on his drinking the night of
the prom and the post-prom. What did he say to you
during the superintendent's hearing?

A. Well, there were a couple of different
statements regarding that issue. One was at one point,
he said he had four or five sips and then another point
he said he had 11 or 12. So in my mind, at this time it
didn't matter, though; he had some. And I had to make a
determination whether or not he actually violated the
policy, and he had.

Q. Did he ever deny drinking alcohol?

A. No.

Q. Did he say to you during the superintendent's
hearing when he consumed the alcohol?

A. It was prior.

Q. Prior to what?

76

A. To post-prom.

Q. Okay. Was it between the prom and the
post-prom, prior to, or you don't know?

A. I don't recall. If he said it was prior to
prom, before prom and before post-prom I don't recall,
but it was prior to post-prom.

Q. At any time during the superintendent's
hearing, did Andrew or his parents express an interest
in having Andrew return to school?

A. No.

Q. What was their problem?

A. They very clearly said they have no issue with
the suspension, they're not arguing that. They wanted
him to walk in graduation. And my response --

Q. What did Detective Dissinger specifically say
about the sanction of not participating in the
graduation ceremony?

A. He thought it was inappropriate, basically.

Q. Why? What did he say?

A. Because it's part of the educational program.

Q. Is it?

A. No.

Q. Okay. What is the graduation ceremony itself?

A. The ceremony is a formal kind of event where
students walk across the stage and are handed their

77

diploma.

Q. Will Andrew receive a diploma evidencing his
graduation from the Manheim Township School District?

A. Absolutely.

Q. And will he receive that diploma
notwithstanding his suspension?

A. He will receive it despite being suspended.

MR. FRANKHOUSER: Cross-examine.

THE COURT: Hold on right there one second. I
also have an 11. I just want to see whether I need to
do that. I'll be right back.

Thank you very much. I'm now clear until
noontime. You may cross-examine.

CROSS-EXAMINATION

BY MR. WINTER:

Q. Morning, sir. Just a few questions for you.

We had talked to Mr. Mayfield and I believe you
heard all of this about the Code of Conduct, Plaintiff's
Exhibit 1. You're familiar with that document,
obviously.

Now, you would agree with me that consumption
of alcohol or other controlled substances is an offense
for which expulsion is potentially a consequence under
the school Code of Conduct?

A. And under board policy.

78

Q. Okay. Very good.

Well, it's board policy that's been
incorporated into the Code of Conduct, fair?

A. Right.

Q. Okay. Now, in terms of Mr. Mayfield's
testimony, you had heard that he believed that there was
an informal hearing, a formal hearing, then a
possibility for a board hearing. Okay? Is that
procedure set forth in writing anywhere?

A. In board policy.

Q. Okay. Is that board policy published as part
of the Code of Conduct?

A. It's referenced in the Code of Conduct.

Q. Okay. But that's not something that's
distributed to parents, is it?

A. It's available on our website. Anybody can
view it and download it and do whatever they want to it.

Q. Okay. Now, someone working school
administration, you're obviously familiar with the
Pennsylvania Code in this area, correct?

A. Yes.

Q. Okay. And you're familiar with informal
hearings and there's formal hearings under the
Pennsylvania Code?

A. Yes.

79

Q. There's only two types of hearings?

A. As far as I know, yes.

Q. Okay. And under the Pennsylvania Code, there's no such thing as a superintendent's hearing?

A. Not spelled out in the code, no.

Q. Okay. Now, Mr. Mayfield testified that he believed that the hearing on Monday fit the requirements for an informal hearing. Do you agree with that?

A. I'm sorry, would you mind saying that again?

Q. He had testified that he believed that the hearing that occurred on Monday, May 21st, fit the requirements for an informal hearing. Do you agree with that?

A. Essentially, it does.

Q. Okay. And you're aware that for an informal hearing, there had to be advance written notice to the student or the student's parents of the disciplinary action?

A. I said it could qualify as an informal hearing, yes.

Q. Okay. To your knowledge, was any advance written notice of the May 21st informal hearing given to Mr. Dissinger or Mr. Dissinger's parents?

A. To my knowledge, no.

Q. Okay. The May 23rd hearing, Wednesday hearing

80

that was before yourself, you heard Mr. Mayfield testify that he believed that fit the requirements for a formal hearing. Do you agree with that?

A. No, I do not.

Q. Okay. So this was some other type of hearing, it was not a formal hearing?

A. Our process is an informal hearing with the assistant superintendent or superintendent.

Q. Okay. So you were saying that there were actually two informal hearings?

A. I'm saying the first one can qualify as one. I do not view it as such.

Q. Okay. The second one was an informal hearing you're saying?

A. Yes, informal hearing, second one.

Q. Okay. As we discussed, written notice of an informal hearing is required. Was there written notice provided in advance of the hearing on the 23rd?

A. No, because the -- it was moved up at the Dissinger's request.

Q. Okay. Sir, you had stated that in your opinion, even though Andrew Dissinger completed the graduation requirements, if he were expelled, he would not be able to receive a diploma?

A. Correct.

81

Q. Okay. What do you base that conclusion on?

A. He would no longer be a student prior to graduation if he was expelled by the school board.

Q. Okay. Is there a specific section of the Pennsylvania Code that you're relying on in drawing that conclusion?

A. I wouldn't be able to cite for you any kind of code, no.

Q. Okay.

A. But if he's not our student, he cannot graduate with his class.

Q. Even if he completed all the graduation requirements?

A. Correct. If he is expelled prior to the last day of seniors, which is today, he would not be our student.

Q. Okay. All right. You had testified that at the hearing on Wednesday, there had been a variety of statements by Mr. Dissinger about how many sips of alcohol he had taken, and obviously Mr. Mayfield did not recall that. Is there any reason that you can account for the differences in your recollection of how many sips of alcohol he took?

A. Well, you're asking me to speculate about Mr. Mayfield's recollection?

82

Q. Well, I'm asking do you know any reason --

THE COURT: Excuse me. No, you're not to speculate about his reasoning. You're to answer as best you know from what you observed.

THE WITNESS: Okay. Would you mind repeating the question then, please?

BY MR. WINTER:

Q. Sure. Do you know why your recollection and Mr. Mayfield's recollection of how many sips of alcohol was presented would differ?

A. No.

Q. Okay. At the conclusion of the superintendent's hearing, was there any type of written notification, statement of rights, anything like that given to either Mr. Dissinger or his parents in respect to their right to a formal hearing?

A. A written notification went home I believe via certified mail, and I believe they attested to the fact they received it stating what the disciplinary action is -- basically restating what was said in the hearing -- and if they don't comply with that, they were subject to a board hearing at which time he could be expelled.

Q. You're referring to a letter that was sent by yourself on May 24th?

83

1    A.   Yes.

2         MR. FRANKHOUSER:   Number 2, I believe.

3         You're referring to a letter that was sent by

4    yourself?

5    BY MR. WINTER:

6    Q.   I'm showing you Defendant's Exhibit Number 2.

7    Is that the document you're referring to?

8    A.   That is correct.

9    Q.   Okay.  And Document Number 2, does it say

10   anything in there about a right to a formal hearing?

11   A.   No, it does not.

12   Q.   What it says is if he fails to comply with the

13   discipline already in place, he would then have a right

14   to a formal hearing?

15   A.   He chose the informal hearing.  The Dissingers

16   chose the informal hearing instead of the formal

17   hearing --

18   Q.   Okay.

19   A.   -- because it was explained to them that in a

20   formal hearing -- in a formal hearing, he runs the risk

21   of being expelled.

22   Q.   Okay.  And, obviously, neither Mr. Dissinger or

23   his parents, they never signed any type of waiver, did

24   they, giving up a right to a formal hearing?

25   A.   No.

84

1    Q.   So you're aware that Andrew Dissinger, he's

2    legally an adult?

3    A.   Yes.

4    Q.   Okay.  And draw your attention to Defendant's

5    Exhibit 2, you sent that to Mr. Dissinger's parents?

6    A.   That's correct.

7    Q.   Why didn't you send it to Mr. Dissinger

8    himself?

9    A.   Because as Mr. Mayfield had testified earlier,

10   he said his parents are privy to all of it, so we sent

11   it to the parents.

12   Q.   And you understand -- do you understand that a

13   FERPA is a waiver of privacy, it's not a waiver of

14   rights?

15   A.   Yes.

16   Q.   Okay.  You understand that Mr. Dissinger --

17   Andrew -- has not assigned his rights to his parents?

18   A.   Correct.

19        MR. WINTER:   That's all I have, Your Honor.

20        THE COURT:   Redirect, please.

21        MR. FRANKHOUSER:   Nothing, Your Honor.

22        THE COURT:   You may step down, sir.

23        I'm sorry, before you do, Doctor, please.

24        THE WITNESS:   Yes.

25        THE COURT:   I think you were quite clear on

85

1    your response in cross-examination, but it is my

2    understanding from your testimony that if expulsion

3    prior to the last day of class were to happen,

4    Mr. Dissinger would clearly not have graduated; is that

5    correct?

6         THE WITNESS:   That is my testimony, yes.

7         THE COURT:   And that is what was relayed to the

8    parents at the meeting that you had in your office?

9         THE WITNESS:   Yes.

10        THE COURT:   You've heard testimony -- and I

11   believe this was from Andrew -- that one of the reasons

12   why he wanted to -- wanted to be at graduation

13   tonight was because of those who were going to be here;

14   grandparents, aunts, uncles, listing a number of

15   people.  Is there not a ticket limit policy at the

16   Calvary Church relative to Manheim Township graduation?

17        THE WITNESS:   There is.

18        THE COURT:   How many is the limit for each

19   student to have tickets?

20        THE WITNESS:   Mr. Mayfield could answer this

21   more definitively than I, but I believe it's three or

22   four tickets per family for the actual venue.

23        THE COURT:   Now, I also understand there is a

24   sub-venue, which would be the anteroom where I think

25   it's televised or something like that; is that correct?

86

1         THE WITNESS:   That's correct.  And in addition

2    to that, this is the first year we're actually

3    streaming.  We got the copyright laws to be able to

4    stream it on the internet.

5         THE COURT:   So people can watch it at a

6    different location?

7         THE WITNESS:   Wherever they are.

8         THE COURT:   But as to the people, Calvary

9    itself, three tickets for inside I'll call it the

10   anteroom?  I know it's a larger place, but it's not with

11   where the students are; is that correct?

12        THE WITNESS:   That's correct.

13        THE COURT:   Thank you.

14        Any questions relative to mine from counsel?

15        MR. WINTER:   Very briefly.

16             CROSS-EXAMINATION

17   BY MR. WINTER:

18   Q.   My understanding, sir, is -- well, three or

19   four may be the standard number of tickets, there is a

20   procedure in place for students attending graduation to

21   request additional tickets?

22   A.   They may request it; if any are available, they

23   are allowed to have them.  I don't speak to the nuances

24   of how that all works, but that is a possibility.

25   Q.   Okay.  So, I mean, there's definitely a

87

1  possibility that more than three or four people that
2  attend per family?
3      A. Yeah, it's possible.
4      Q. Certainly more than three or four they would be
5  able to view via that anteroom?
6      A. Yes, anteroom's available and stream is
7  available.
8          MR. WINTER:  Okay.  Very good.  Thank you.
9          THE COURT:  Thank you.
10         I clearly know that the questions I asked have
11 absolutely anything to do with this, but I was curious
12 as to the policy because I know it had been published
13 and because two of my children fairly recently --
14 they're 24 and 25 -- graduated.  I didn't know if there
15 was anything different, but I'm tickled to hear about
16 the streaming possibilities.
17         Anything further?
18         MR. FRANKHOUSER:  Move the admission of
19 Defendant's Exhibits 1, 2, 3 and 4.
20         THE COURT:  Any objection, counsel?
21         MR. WINTER:  Your Honor, to the extent that
22 Exhibit 4 contains testimony that you found to be
23 inadmissible, I would object to that portion of the
24 exhibit.
25         MR. FRANKHOUSER:  I think you mean -- oh, no.

88

1  It would be --
2          THE COURT:  I have 4 as Mayfield.
3          MR. FRANKHOUSER:  I think it's Mr. Mayfield's
4  memorandum of May 20th.
5          MR. WINTER:  Oh, right.  And I would also
6  object to the BAC result -- Breathalyzer result that is
7  handwritten on Exhibit 1.
8          MR. FRANKHOUSER:  I don't care in the
9  slightest.
10         THE COURT:  I realize that was handwritten at
11 some time probably before the notice went out or by
12 someone else after the notice was received.  And for the
13 same purpose as I ruled earlier relative to the BAC, it
14 certainly will not be taken into consideration by the
15 Court.
16         Would counsel like a brief closing statement?
17         MR. FRANKHOUSER:  Very brief.
18         MR. WINTER:  Yes, Your Honor.
19         THE COURT:  Petitioner.
20         MR. WINTER:  Your Honor, what I would ask you
21 to do is take a closer view -- and from my observation
22 of you, I believe you have been doing just this -- of
23 the regulations in the Pennsylvania Administrative Code
24 12.6 and 12.8.  In particular, I would call your
25 attention to 12.8(a) in a case involving a possible

89

1  expulsion, the student is entitled to a formal hearing.
2  That's what 12.8 code section and the two witnesses you
3  heard said that expulsion here.  Moreover, if you take a
4  look at 12.6 I believe it is (b)(2), (b)(2) says that
5  expulsion requires a formal hearing.  So it's beyond
6  entitlement, it is a requirement is what is going on in
7  this case.
8          In this case, it's very, very clear, despite
9  however you characterize this, whether you go with
10 Mr. Mayfield's interpretation or whether you go with
11 Mr. Williams' interpretation, the requirements for a
12 formal hearing clearly have not been met by the school.
13 The school is what I believe they're going to argue that
14 the informal hearing, which was either held on the 21st
15 or the 23rd or both, fit the requirements.
16         There is no such thing as a superintendent's
17 hearing under the Pennsylvania Administrative Code.
18 There's no such thing as a superintendent's hearing
19 under the Code of Conduct.  There's simply no authority
20 for that hearing or what it should entail.
21         In respect to an informal hearing, there must
22 be advanced written notice of the hearing.  That notice
23 clearly did not occur.  And of the two cases I handed
24 you this morning, the one out of Mifflin County goes on
25 to state that where written notice has not been

90

1  provided, the Court may go ahead and find the discipline
2  a nullity and grant an injunction.  And that's what
3  we're seeking here.
4          The requirements for the -- under the
5  Pennsylvania Administrative Code set forth a minimum
6  level of due process to be afforded to students.  In
7  this case, those due process requirements were not met.
8  Now, there's some argument that Mr. Dissinger could
9  possibly be expelled at some point in the future if the
10 school board were to convene and hold a formal hearing.
11 I don't believe that's for this Court to make a decision
12 on.
13         If, in fact, that does occur, that is one of a
14 multitude of possibilities of a school board; to choose
15 to dismiss the matter, a school board choose to impose
16 the same penalty he already received, a school board
17 could choose to impose a higher penalty, but not
18 expulsion.  And we go back to the legal issue, which I
19 don't have a definitive answer for, but I believe it's
20 very arguable how -- which is how can a school district
21 refuse to award a diploma to someone who completed all
22 graduation requirements.  I don't believe that's an
23 issue the Court should be considering.  I believe what
24 the Court has to look at were the due process rights of
25 Mr. Dissinger met.  I submit to you they have not been.

REPORTER'S CERTIFICATE

1

2

3       I HEREBY CERTIFY that I was present upon the

4 hearing of the above-entitled matter and there reported

5 stenographically the proceedings had and the testimony

6 produced; and I further certify that the foregoing is a

7 true and correct transcript of my said stenographic

8 notes.

9       In testimony whereof, I have hereunto

10 subscribed my hand this 25th day of June 2012.

11

12

13 _____

      Susan A. Milton
14    Official Court Reporter

15

16

17

18       AND NOW, _____, _____, this

19 transcript is approved and ordered to be filed.

20

21                    _____

      HOWARD F. KNISELY, Judge
22

23

24

25

# EXHIBIT B

**Manheim Township School District**
**Code of Student Conduct**

Dear Student and Parent/Guardian:

The Manheim Township School District <u>Code of Student Conduct</u> was developed to inform you of the crucial nature of a positive learning environment that includes clearly defined expectations for student attendance and behavior. The Board of School Directors has approved numerous policies to address areas relating to pupils within the Board's policy manual. The <u>Code of Student Conduct</u> includes reference to each of these applicable Board approved policies. Copies of these policies are available in the district office, school offices, and libraries and the district web site at http://www.mtwp.net. These policies contain within them, the legal citations from which they were developed. When student behaviors are inappropriate and impact negatively on a positive learning environment, the disciplinary options that are identified in the <u>Code of Student Conduct</u> will be utilized by School Administrators.

This publication meets the federal requirements of No Child Left Behind (NCLB), Section 4114 (7) (e) by establishing a code of student conduct that clearly states the responsibilities of students, teachers, and administrators in maintaining a classroom environment that –

- allows a teacher to communicate effectively with all students in the class;
- allows all students in the class to learn;
- has consequences that are fair and developmentally appropriate;
- considers the student and the circumstances of the situation; and is enforced accordingly.

This <u>Code of Student Conduct</u> also:

- Meets the legal requirements of Section 12.3(c) of the Pennsylvania Code, which requires that the District adopt these provisions and distribute copies to both students and parents/guardians.
- Meets the requirements of Act 26 of 1995 as it relates to possession of weapons and the Safe Schools Initiative.
- Establishes a rational standard of behavior that is expected of all students in achieving the objective of providing a safe environment for the pursuit of knowledge.
- Helps prepare students for life in a democratic society where adopted laws govern and maintain a measure of protection and security for all citizens within the framework of freedom.
- Supports our Mission Statement.

This <u>Code of Student Conduct</u> was designed to help provide a safe school environment that is conducive to learning. The Code outlines the cooperative effort among students, parents and school personnel and defines the essential role of each participant in the process.

Please review this <u>Code of Student Conduct</u> to ensure your understanding in this vital approach toward guiding our young people and providing a safe school environment.

Thank you for your continuing interest in the educational process.

Sincerely,

*Gene Freeman*

Gene Freeman, Ed.D
Superintendent of Schools